## AGNES C. GALT *v.* LULIA WAIANUHEA.

RESERVED QUESTIONS OF LAW FROM FIRST CIRCUIT COURT.

ARGUED MARCH 17, 1905.          DECIDED APRIL 14, 1905.

FREAR, C.J., HARTWELL AND WILDER, JJ.

LANDS.

> Land in dispute held not included in Royal Patent Grant 1629.

CROWN LANDS—*adverse possession.*

> Adverse possession of Crown Lands from 1873 to the present time cannot be shown.

EVIDENCE.

> Proceedings on which Land Commission Award and Royal Patent Grant issued held not admissible in this case.

### OPINION OF THE COURT BY WILDER, J.

This is an action of ejectment during the trial of which in the first circuit court certain questions were reserved for the consideration of this court. Plaintiff claims title in fee simple to the premises described in the complaint under Land Patent No. 4548. Defendant claims that this land patent is of no force because prior to its issuance the disputed land had already been granted to one Lorrin Andrews by Royal Patent Grant 1639, and she also claims title by adverse possession.

1. The first question reserved is as follows: Whether, under the evidence, the plaintiff has shown title in herself to the premises in controversy; that is to say, whether on all the records and papers introduced there was left a remnant which came to the Territory of Hawaii and by the patent of the government to the plaintiff, lying between the lands of Kaaha, of Holoua and of Andrews.

It appears that by the mahele of 1848 one Kaaha became entitled to claim ½ of Kawananakoa, an ili in Honolulu, for which he subsequently received a Land Commission Award. One Holoua also received a Land Commission Award of a house lot in Kawananakoa out of the lands of Kaaha. The other ½ of Kawananakoa was reserved or retained by the King by the act of June 7, 1848. The ½ of Kawananakoa that Kaaha actually received by virtue of the Land Commission Award was less than one-half of this ili in area. The record does not disclose whether or not it was one-half in value. It is unnecessary to say whether this "½" meant one-half in area, one-half in value, or the share that was actually taken by the different parties. The difference would be that, in the one case, the land not having been assigned would remain government land, and, in the other case, the land became a part of the so called crown lands. As the result is the same in either event, so far as these present proceedings are concerned, we assume that the land was a part of the so called crown lands.

The land in dispute is a small strip on Liliha street consisting of 6250 square feet and lying between the lands of Kaaha, Andrews and Holoua. It is not contended by defendant that this strip was included in either the award to Holoua or to Kaaha, but she does claim that it was included in Royal Patent Grant 1639 to Lorrin Andrews, and that consequently plaintiff has shown no title in herself. This grant was made in 1855. Whether or not this grant, purporting to be of government land, had the effect of conveying away land which belonged to the King as distinguished from the government, it is unnecessary to say, because we have come to the conclusion that it did not include the land in dispute.

That portion of the description in grant 1639 which defendant claims includes the land in dispute is as follows:

*Pasture Land:* Commencing at middle of stream, on makai edge of Wyllie road, the east corner of this land running

N. 50½ W. 21 64-100 chs. along Wyllie road to foot of
pali; thence

N. 54°   W.   8 38-100 chs. up pali to high rock on top the
                             N. corner of this land; thence

S. 37½   W.   4 16-100 chs. along on upper edge of pali to
                             west corner; thence

S. 34¼   E.   3 36-100 chs. down pali to long rock in path;
                             thence

S. 57¾   E.   4  8-100 chs. to stone wall at foot of pali;
                             thence

S. 39¼   E.  16 96-100 chs. along Dr. Rooke's land to X in
                             wall; thence

N. 39¼   E.   2  5-100 chs. along wall to angle; thence

N. 46¾   E.   1 31-100 chs. to N. corner of Holoua's land;
                             thence

S. 40°   E.   2  7-10  chs. along Holoua's to corner of
                             Walls; thence

N. 61½°  E.  44-100 chs. along wall; thence

Along stream direct to place of commencement—16 78-100
                             acres.

The metes and bounds appear to fit accurately to the monuments on the ground. In order for this grant to include the strip in question the clear calls of the survey would have to be disregarded. It is urged by defendant that this grant must have included the land in dispute because it could not have been intended to leave a remnant. But overlaps and gaps frequently resulted in the early surveys in these islands. We are of the opinion that there was a remnant left.

The first reserved question is answered in the affirmative, that is to say, from all the records and papers introduced there was left a remnant which came to the Territory of Hawaii and by the patent of the government to the plaintiff lying between the lands of Kaaha, of Holoua and of Andrews.

2. The second reserved question is as follows: Whether evidence tending to show exclusive, notorious and continued possession on the part of the defendant, from the year 1873 to the present time, is admissible; that is to say, whether in case such a remnant existed it was crown land so called and whether

adverse possession can be shown to crown land during any portion of said period.

On the assumption that the land in dispute was a part of the so called crown lands, this second question arises. By an instrument signed by the King, dated March 8, 1848, which was ratified by an act of the legislature of June 7, 1848, Kamehameha III retained (or reserved) certain lands, of which the land in dispute was a part, "to be the private lands of His Majesty, Kamehameha III, to have and to hold to himself, his heirs and successors forever." Revised Laws, pp. 1197-1201. From that time up to January 3, 1865, these reserved or retained lands were leased, mortgaged, sold and dealt with by the King and his successors in the same manner as the lands of any one else. See *Estate Kamehameha IV,* 2 Haw. 715; *Brown v. Spreckels,* 14 Haw. 399, 405. On January 3, 1865, an act to relieve the royal domain from encumbrances and to render the same inalienable was passed. The preamble and section 3 of this act were as follows: "WHEREAS, by the act entitled 'An act relating to the lands of His Majesty the King, and of the Government,' passed on the 7th day of June, A. D. 1848—it appears by the preamble, that His Most Gracious Majesty Kamehameha III, the King, after reserving certain lands to himself as his own private property, to surrender and make over unto his chiefs and people, the greater portion of his Royal Domain. *And whereas,* by the same act it was declared that certain lands therein named, shall be private lands of Kamehameha III, to have and to hold to himself, his heirs and successors forever; and that the said lands shall be regulated and disposed of according to his royal will and pleasure, subject only to the rights of tenants. *And whereas,* by the proper construction of the said statute the words 'Heirs and Successors,' mean the heirs and successors to the Royal Office. *And whereas,* the history of said lands shows that they were vested in the King for the purpose of maintaining the Royal State and Dignity; and it is therefore disadvantageous to the public interest, that the said lands should be alienated, or the said Royal Domain dimin-

ished. *And whereas, further,* during the two late reigns, the said Royal Domain has been greatly diminished, and is now charged with mortgages to secure considerable sums of money; now, therefore,

*Be it enacted, by the King and the Legislative Assembly of the Hawaiian Islands, in the Legislature of the Kingdom assembled:*

"Section 3. It is further enacted, that so many of the lands which by the Statute enacted on the 7th of June, 1848, are declared to be the private lands of His Majesty Kamehameha III, to have and to hold to himself, his heirs and successors forever, as may be at this time unalienated, and have descended to His Majesty Kamehameha V, shall be henceforth inalienable, and shall descend to the heirs and successors of the Hawaiian Crown forever; and it is further enacted, that it shall not be lawful hereafter to execute any lease or leases of the said lands, for any term of years to exceed thirty." Revised Laws, pp 1226-1227.

After the passage of this statute these lands became known as "crown lands."

Article 95 of the Constitution of 1894 provided as follows: "That portion of the public domain heretofore known as Crown Land is hereby declared to have been heretofore, and now to be, the property of the Hawaiian Government, and to be now free and clear from any trust of or concerning the same, and from all claim of any nature whatsoever, upon the rents, issues and profits thereof. It shall be subject to alienation and other uses as may be provided by law. All valid leases thereof now in existence are hereby confirmed."

After the promulgation of this Constitution it is not contended that the statute of limitations could run as against crown lands.

The statute of limitations as to land was not passed until 1870, although the principle of adverse possession running against land had been recognized by this court prior to that time. See Revised Laws, section 1988 and note.

Defendant contends, assuming that the land in dispute was a crown land remnant, that the case of *Harris v. Carter,* 6 Haw.

195, decided in 1877, finally decided that crown lands were subject to the statute of limitations, while plaintiff argues that the statement of Justice Judd in that case that crown lands were subject to the statute of limitations was a dictum, but, even if not so, either by virtue of the Constitution of 1864 or the act of January 3, 1865, or both, adverse possession could not run against crown lands.

The act of January 3, 1865, took the control of the crown lands out of the hands of the King and put it into the hands of crown land commissioners, and further provided that these lands "shall be henceforth inalienable," and this was done for the purpose, among other reasons, of "maintaining the royal state and dignity." No clearer language could be used to indicate that such lands should not and could not be disposed of. And what cannot be disposed of cannot be taken away by adverse possession. The same reasons for holding that statutes of limitation do not run against the state exist for holding that they do not run against crown lands under this statute, the income from which crown lands was devoted to governmental purposes, that is, to help maintain the dignity of the sovereign.

In *Gibson v. Choteau,* 13 Wall. 92, Mr. Justice Field says: "It is a matter of common knowledge that statutes of limitations do not run against the state. That no laches can be imputed to the King and that no time can bar his rights, was the maxim of the common law and was founded on the principle of public policy, that as he was occupied with the cares of government, he ought not to suffer from the negligence of his officers and servants. The principle is applicable to all governments, which must necessarily act through numerous agents, and is essential to a preservation of the interests and property of the public."

This quotation is cited with approval in *Kahoomana v. Moehonua, Minister of the Interior,* 3 Haw. 635, 640.

Angell on Limitations at p. 31 says: "It is some times asserted, that the reason of the above maxim (nullum tempus occurrit regi) is, that the King is always busied for the public

good; and, therefore, has no leisure to assert his right within the time limited to subjects. The true reason it has been thought, however, is the great public policy of preserving the public rights, revenues and property from injury and loss by the negligence of publc officers. And the prerogative right of the King in relation to acts of limitation in England is, in fact, nothing more than a reservation or exception, introduced for the public benefit, and is equally applicable to all governments."

Consent lies at the foundation of the doctrine of adverse possession. The proposition that title by adverse possession presumes a grant and that such presumption cannot be entertained against one incapable of granting (1 Cyc. 1113) was approved in *Kahoomana v. Moehonua, Minister of the Interior,* 3 Haw. 635, 640. If there never could have been an alienation of the crown lands after January 3, 1865, how could adverse possession run against those lands on the theory that there had been a grant of the same?

This statute of 1865 was assented to by all concerned, by the King, the one most interested, who signed it, by the legislature, which passed it, and by the people of these islands who have acted on it ever since up to the constitution of 1894, when the lands were formally declared to be government lands. Counsel for defendant in the oral argument of the case at bar, but not in their brief, questioned the constitutionality of this statute. So far as appears at present, we are inclined to believe that that statute was constitutional.

The foregoing views make it unnecessary to decide on the effect of the inviolability clause in the constitution of 1864. Whether or not the statement by Justice Judd in the case of *Harris v. Carter,* 6 Haw. 195, to the effect that in 1877 and prior thereto crown lands were subject to the statute of limitations, was required to be made upon the issues submitted in that case, it is also unnecessary to say, because this opinion does not accord with that statement. It should be stated, however, that the statute of January 3, 1865, above referred to, does not

appear to have been called to the attention of the court in that case.

The second question is answered in the negative, that is to say, evidence tending to show exclusive, open, notorious and continued possession of the land in dispute, on the part of the defendant, from the year 1873 to the present time, is not admissible.

3. The third reserved question is as follows: Whether the proceedings on which the Land Commission Awards and the Royal Patent, issued on the grant to Andrews, were based, are admissible for any purpose.

In connection with Royal Patent Grant 1639 to Lorrin Andrews, defendant offered in evidence a petition to the privy council dated August 28, 1854, a deed from Samuel Kuluwailehua to Lorrin Andrews accompanying the petition, and also the minutes of the original survey and the order of the privy council dated August 28, 1854, making the grant; and in connection with Land Commission Award 1139 to Holoua defendant offered in evidence the original proceedings on which said award was made. This testimony the trial judge refused to admit in evidence. It was offered on the theory that there was a latent ambiguity to explain. If such is the case it would be admissible. *Ookala Sugar Company v. Wilson,* 13 Haw. 127, 131. But, as there is no latent ambiguity, it is not admissible.

The answer to the third reserved question should be in the negative, that is to say, the proceedings on which the Land Commission Award and the Royal Patent were based are not admissible.

The case is remanded to the circuit court of the first circuit for further proceedings consistent with this opinion.

*Ballou & Marx,* attorneys for plaintiff.

*Castle & Withington,* attorneys for defendant.