Syllabus.

# ALFRED W. CARTER, TRUSTEE, *v.* TERRITORY OF HAWAII.

## No. 959

APPEAL FROM WATER COMMISSIONER.

HON. J. A. MATTHEWMAN, COMMISSIONER.

ARGUED AUGUST 6, 7, 1917.            DECIDED NOVEMBER 12, 1917.

ROBERTSON, C.J., QUARLES AND COKE, JJ.

EASEMENTS—*water rights—abandonment—non-user.*

Mere non-user of water of however long duration does not constitute an abandonment of an appurtenant water right where there has been no substituted use, and there are no intervening equities, or there has been no adverse user.

ABANDONMENT—*water rights—non-user—proof.*

Non-user of a right to take water from a stream is not shown by proof that branch ditches have been filled up or disused, where it appears that the intakes and main ditches leading from the stream have been maintained, and it does not appear that water has not been diverted as it has been available under a diminished supply.

WATERS AND WATERCOURSES—*private water rights—basic law.*

Private water rights in Hawaii are governed by the principles of the common law of England except so far as they have been modified by or are inconsistent with Hawaiian statutes, custom or judicial precedent. The law of priority of appropriation which prevails in the arid sections of the mainland of the United States has never been recognized in this Territory.

SAME—*ancient ditches—appurtenant rights.*

Ancient ditch systems connected with running streams became incorporated into the permanent topography of the country, and upon the acquisition of private titles to lands to which such ditches were tributary the right to water therefrom, in accordance with custom, passed as an appurtenance or incident without express mention in the award or grant.

SAME—*same—proportional diminution.*

Ancient ditches which were constructed and have been used for the purpose of diverting a constant flow of water from a stream and distributing it among several parcels of land are to be regarded virtually as natural water courses, and in case of drought or

diminished supply the flow in one ditch may not be increased by artificial means to the detriment of lands entitled to water from another ditch, but the dams must remain as they were and all must suffer accordingly. The general principle of proportional diminution in times of scarcity applies as well to different lands along one ditch as between different ditches from the same stream, but where the supply has greatly diminished the rule will not be applied as between the several owners on a long ditch if the entire flow would be lost through seepage and evaporation.

SAME—*natural use—artificial use—superior right.*

The natural use of water for domestic purposes is a superior right to its use for artificial purposes.

SAME—*irrigation right—proof—quantity.*

Where a customary use of water for irrigation upon land at the time it first became the subject of private ownership is shown by satisfactory evidence the quantity is to be determined by the amount used at and immediately prior to the date of the award or grant, but the right is not to be denied merely because that quantity ·was not measured and cannot be proven.

SAME—*new use—burden of proof.*

Under ordinary circumstances the burden of showing that a new diversion of water does not prejudice the right of another is upon the party asserting the right to the new use, but where the extent of the right possessed by the other is not known to himself and cannot be ascertained, the new use, if a beneficial one, ought not to be restrained upon merely conjectural grounds.

SAME—*right to drinking water on ahupuaas.*

The right to drinking water declared by section 471 of the Revised Laws for the people on *ahupuaas* privately owned is a right in gross as distinguished from an appurtenant right to water for domestic use.

SAME—*change in method of diversion.*

A concrete dam to divert water from a stream may be substituted for a rubble dam of loose construction if the change works no injury to other rights in the stream.

SAME—*surplus waters of stream.*

Where a stream flows through one *ahupuaa* into another each *ahupuaa* is entitled to a reasonable use of the surplus water of the stream according to the principles applicable to riparian rights at common law.

SAME—*water controversy—authority of commissioner.*

In a water controversy the authority of the circuit judge, sitting

as commissioner, and the supreme court on appeal, is limited to ascertaining, determining, defining and enforcing proven rights.

### OPINION OF THE COURT BY ROBERTSON, C.J.

This is a proceeding brought under the statute (R. L. 1915, Ch. 165) for the purpose of determining water rights in the Waikoloa stream, at Waimea, Island of Hawaii. The petition, which was filed on June 13, 1914, named as respondents the Territory of Hawaii and about sixty-two individuals. Many of the respondents made no appearance and an order of default was entered against them. The petitioner's claims were contested only by the Territory, and both the Territory and the petitioner have appealed from the decision and decree of the commissioner. Respective counsel agree that the rights of those respondents who presented their claims and who have not appealed are not in issue in this court, and that the contest has narrowed down to one between the petitioner and the Territory only. In the petition the petitioner's ownership of certain lands was alleged and the right to the quantities of water claimed as appurtenant thereto for irrigation purposes by immemorial custom was stated as follows: An area of 94.3 acres at Kaomaloo, within and a part of the ili of Waikoloa, through the ditch known as the "Lyons" ditch, not less than 940,000 gallons per day; three *kuleanas* in the government land of Waikoloaiki, comprising an area of about nine acres, through a ditch (called Lanakila), not less than 95,000 gallons per day; five *kuleanas* in the government land of Lalamilo (adjoining Waikoloa), and a grant (R. P. 1157) of a parcel of land containing an area of 250 acres at Lihue (stipulated to be a portion of the "land or so-called ahupuaa" of Waimea), not less than 2,000,0000 gallons per day through the ditch known as the "Akona" ditch. Also water for domestic use upon a parcel of land described in a deed from Kamehameha IV

to Waimea Grazing Co., adjoining the Waikoloa stream; and the right to the surplus freshet water of the stream as it flows into and upon the *ahupuaa* of Ouli (adjoining Lalamilo) was claimed. It was alleged that in the year 1905 the Territory constructed a dam in the Waikoloa stream above the lands of the petitioner by means of which and a pipe system connected therewith it is wrongfully diverting large quantities of water to the damage of the petitioner. The prayer was for the determination of the respective rights of the petitioner and the respondents, that the petitioner's claims be confirmed, and that the maintenance of the dam and the diversion of the water by the Territory be adjudged to be unlawful. The answer of the Territory alleged that practically all of the waters of the Waikoloa stream have their source upon government lands and that the stream flows for the greater part of its length down to the *ahupuaa* of Ouli upon lands belonging to the Territory; that the Territory is the owner of the water of the stream except only in so far as rights therein may have passed as appurtenant to parcels of land awarded to claimants by the land commission of 1846; that anciently water for irrigation was used on the ili of Waikoloa at Kaomaloo, though not to the extent claimed by the petitioner, but whether such use was exercised at the time of the award of the land and passed as an appurtenance thereto was left to the petitioner to prove; that the water used on the *kuleanas* in Waikoloaiki and Lalamilo respectively was for domestic purposes only, and whether the right to such use passed into private ownership by awards of said *kuleanas* was left to the petitioner to prove; that no water right passed as an appurtenance with the grant of the land at Lihue; and the claim of the right to any of the surplus or storm waters of the Waikoloa stream as appurtenant to the *ahupuaa* of Ouli was disputed and denied. It was alleged that whereas the dam

at the intake of the Lyons ditch was originally composed of rubble of loose construction which permitted of considerable percolation, the petitioner, in or about the year 1907, constructed a new dam made of concrete with which to divert water into the Lyons ditch, and that said new dam was erected at a point about fifty feet further up stream than the former dam.   It was also alleged that formerly a portion of the water of the Lyons ditch and a portion of that of the Akona ditch combined at a certain point and were augmented by water (arising on government land) running through ditches from Pelekuaiau pond and flowed past the lands of the petitioner to the land of Lalamilo, about 10,000 feet below the petitioner's land at Lihue, and was used by persons then living there (but who acquired no title to land) for domestic purposes and irrigation.   It was also alleged that such rights to water as may have passed as appurtenant to the lands of the petitioner and the other respondents have been "to a large extent" abandoned and lost and have reverted to the Territory.   It was further alleged that formerly the rainfall in the locality was much greater than now, that the forests were more extensive, and the flow of water in the Waikoloa stream was much more abundant and constant, and the requirements for artificial irrigation were less extensive than they are at present.   And it was further alleged that the rights of the petitioner are not superior in any way to the rights of the Territory in the waters of said stream and that in times of scarcity the maximum rights of the petitioner and of the other respondents are subject to diminution in accordance with the circumstances. That the diversion of water from the stream by the Territory deprived the petitioner of any water to which he may be entitled was denied.   The answer prayed that the Territory be adjudged to be the owner of all the water of the Waikoloa stream except only such as passed as appur-

tenant to the lands awarded by the land commission and have not been abandoned; that its right to maintain the dam in the stream be adjudged; that the rights of the respondents be determined; and that the petitioner be enjoined from further maintaining the concrete dam or any other dam at the intake of the Lyons ditch differing in construction or location from the original dam at that place.

The commissioner held, as we understand from his opinion, that the lands mentioned in the petition for which irrigation rights were claimed were in fact entitled to such. As to the land at Lihue, he held that it was "entitled to water as of the date of application" for its purchase by Macy and Louzada. He also held that the government land makai of Lihue was entitled to water from the ditches which reached it through Kaomaloo and Lihue, meaning, we infer, that the water was formerly used by the inhabitants there for irrigation as well as domestic use; that the government's right to irrigation water is still existent; and that since there has been a large decrease in the available water supply the petitioner's irrigation rights would have proportionately decreased if they had not been lost. The commissioner held, however, that the evidence was so indefinite and unsatisfactory that it was impossible to say what quantity of water was appurtenant to any particular piece of land, and he further held that by reason of long non-user coupled with the fact that the petitioner as well as the individual respondents, by inaction, had acquiesced in the installation by the Territory of its dam and pipe system, had abandoned their rights to water for irrigation; and that as section 471 of the Revised Laws, relating to the rights of the people on lands awarded to "landlords," is declaratory of ancient rights and of the common law of Hawaii, the petitioner and the individual respondents are entitled to water for domestic use from the

stream. It was held that the Territory has the right to conserve and divert the water of the stream in order to supply the villagers of Waimea with water for their homes. No finding or order was made with reference to the dam erected by the petitioner at the Lyons intake. A decree was entered in accordance with the commissioner's opinion. The Territory was adjudged to be the owner of all of the waters of the Waikoloa stream, surplus and storm waters as well as the normal flow, impressed only with "the obligation of allowing the people of the ahupuaa of Waimea" (including, we take it, the *ilis* in Waimea) to take water from the stream for household purposes. And it was adjudged that neither the petitioner nor any of the individual respondents, by reason of the ownership of lands, or otherwise, is entitled to any of the waters of the stream except for household use.

The case was exhaustively tried; a large number of witnesses were examined; and the transcript of testimony covers about 3400 pages. Elaborate briefs filed by respective counsel show much contrariety of opinion as to the law as well as upon the facts. So far as the facts found by the commissioner depended upon conflicting testimony they will not be disturbed under the ruling made in the case of *Hilo Boarding School* v. *Territory,* 23 Haw. 595.

The *ahupuaa* of Waimea in the district of South Kohala, Island of Hawaii, though mostly taken up by the *ilis* of Waikoloa and Puukapu (*Harris* v. *Carter,* 6 Haw. 195, 207), the former being now owned by the petitioner in this case, gives its name to the general locality in which this controversy arose. The Waikoloa stream, which flows partly upon government land, partly upon land of the petitioner, and for some distance along the boundary between the two, has from time immemorial been tapped by a number of ditches or *auwais* the three principal of which have in modern times been known by the names of Lyons,

Lanakila and Akona.  These and other ditches further down the stream took water out of the stream on either side, but principally on the southerly side, and distributed it by means of numerous branches to the lands now belonging to the petitioner and the individual respondents and, as found by the commissioner, to parts of the land of Lalamilo where it was used by *hoaainas* who obtained no title to the parcels occupied by them (the title thereto remaining in the government), and altogether formed a rather elaborate water system, indicating the presence, long ago, of a considerable population. Commodore Wilkes in his "Narrative of the United States Exploring Expedition" (1838-42) Vol. 4, p. 218, referring to the district of Waimea, apparently meaning South Kohala, said, "The population is registered at six thousand five hundred," while the census of 1866 showed the population of South Kohala to be 1089, a decrease since that of 1860 of 232. There was a conflict in the testimony as to whether the use of the water upon the privately owned lands extended to irrigation or was confined to domestic use, but we believe the weight of the evidence sustains the finding which we understand the commissioner to have made in favor of the right to water for irrigation as appurtenant to the lands in question.  The evidence showed, and it has become an admitted fact, that at the time private titles to these lands were first acquired the flow of water in the Waikoloa stream was very much greater than it has been in recent years.  It was not a mere temporary shortage due to drought that was shown, but a gradual and apparently permanent diminution in the natural water supply. There appears never to have been a division of water by time among the lands in this locality.  The claims were to a continuous flow.

We do not sustain the finding made by the commissioner that the right to water for irrigation purposes appur-

tenant to the petitioner's lands has been lost by abandon-
ment. The alleged abandonment of an easement presents
a question of intention and of fact, the burden of proof
being upon the party making the allegation. Jones on
Easements, Secs. 849, 850. The commissioner based his
conclusion, however, upon three grounds, viz.: (1) non-
user, (2) acquiescence in the erection by the government
of its dam, and (3) express renunciation by the petitioner,
at the hearing of his claimed right to have the government's
dam removed. It appeared that the petitioner had notice,
before the completion of the government's dam, that it was
about to be constructed, or was in process of construction,
and made no attempt to prevent its erection. It also ap-
peared that at the time the property of the petitioner was
temporarily in the hands of a receiver pending the deter-
mination of certain litigation, and the argument is now
advanced that as the petitioner's hands were tied, so to
speak, nothing should be held to his disadvantage because
of his failure to move under the circumstances. We think
there is no force in this contention since notice, by way
of protest or otherwise, of his rights or claims in the
premises could have been given by the petitioner to the
government either through the receiver by permission of
the court, or directly and without such permission, since
the sending of such notice would not have interfered with
the duty of the receiver to conserve the property held by
him under order of court. But, on the other hand, the
government had rights in the water of the Waikoloa stream,
and the petitioner would not be heard to complain of the
erection of the dam until water was diverted or some use
thereof threatened which would actually interfere with
his rights in the water. Counsel for the Territory does
not claim that there was an estoppel. We hold that the
failure of the petitioner to object to the erection of the
dam, either of itself or in connection with the other cir-

cumstances, cannot be regarded as an abandonment. What occurred at the close of the hearing of the case cannot be fairly construed as a waiver or evidence of an intention on the part of the petitioner to abandon any irrigation rights. The record shows that counsel said to the commissioner, "We will stipulate for the record that we do not ask the court to remove the dam * * * We are willing that the system remain there subject to an acknowledgment of petitioner's right to the water up to whatever amount the court decrees. We want title to the water and want those people to be in a position to be compelled to recognize it. * * * We will ask leave to amend the prayer so that we do not seek to remove this dam." The commissioner evidently thought that the maintenance of the dam was entirely inconsistent with any rights in the petitioner to water except for household purposes. It is also evident that counsel, in making his statement, did not so understand it or he would not have made the statement. That the maintenance of the dam for the diversion of water for domestic use is not incompatible with the existence of rights to water for irrigation purposes upon petitioner's lands will be shown later. Non-user, then, remains as the sole prop for the commissioner's finding that there has been an abandonment. But mere non-user of water of however long duration does not constitute an abandonment of the right where there has been no substituted use, and there are no intervening equities, or there has been no adverse user. Jones on Easements, Sec. 863; 40 Cyc. 566; *Wailuku S. Co.* v. *Widemann*, 6 Haw. 185; *Haw. Com. & S. Co.* v. *Wailuku S. Co.*, 15 Haw. 675, 691; *Adams* v. *Hodgkins*, 109 Me. 361, 365; *Sowles* v. *Minot*, 82 Vt. 344, 355. This was recognized by the commissioner, but he held that the evidence of non-user plus the other circumstances proved abandonment. Furthermore, non-user, within the proper sense of the term, we think, was

not shown.   The points at which the exercise of the petitioner's right to water takes place are at the dams by which water is diverted from the stream.   The evidence does not show, and we do not understand it to be contended, that there has been any interruption in the maintenance of the dams, or of the main ditches across the land of the Territory, or an omission to take water from the stream. True, the amount of water diverted during many years past was much less than in former times, but that may be accounted for in the fact of the greatly diminished flow in the stream.   The facts that there has been a failure to use what water has been diverted in recent years for irrigation, and that branch ditches situated wholly upon the land of the petitioner have become filled up or disused do not, we believe, show a non-user of the right within the true meaning of the term.   The ruling of the commissioner on this point must be reversed.

Except as to the land at Lihue, which will be considered presently, the case is free from any claim on either side of prescriptive rights by adverse user.    The principal questions are as to what effect the fact of a greatly diminished supply of water in the stream has upon the rights of the parties, and as to the right of the Territory to make a new use of a portion of the water.   Private water rights in this Territory are governed by the principles of the common law of England except so far as they have been modified by or are inconsistent with Hawaiian statutes, custom or judicial precedent.   R. L. 1915, Sec. 1.   The law of priority of appropriation which prevails in the arid sections of the mainland of the United States has never been recognized in this jurisdiction.   The diversion of water from natural streams by means of artificial ditches for domestic and agricultural use was practiced by the Hawaiians before the advent to these islands of the white man.   The ancient ditch systems connected with running

streams became a permanent feature of the topography of the localities where they were constructed. And upon the acquisition of legal titles to lands to which such ditches were tributary the right to water therefrom passed as an appurtenance or incident without express mention. In *Peck* v. *Bailey,* 8 Haw. 658, 661, Chief Justice Allen said, "There can be no difference of opinion that the complainants were entitled to all the water rights which the lands had by prescription at the date of their title. By the deed, the water courses were conveyed and a right to the water accustomed to flow in them. The same principle applies to all the lands conveyed by the King, or awarded by the land commission. If any of the lands were entitled to water by immemorial usage, this right was included in the conveyance as an appurtenance. An easement appurtenant to land will pass by a grant of the land without mention being made of the easement or the appurtenance. * * * The grantor of complainants has conveyed portions of this *ahupuaa* to several persons. Each grantee will hold all that has been conveyed to him, unless it should conflict with a previous conveyance. This includes the water courses on their lands, and all the water which the lands had enjoyed from time immemorial." The appurtenant rights of *kuleanas* in government *ahupuaas* to water for irrigation are similar to those in privately owned *ahupuaas,* except that in the latter case they might be enlarged by adverse user. In either case the right of any part of the *ahupuaa* which by ancient use was irrigated land would be on an equality with irrigated *kuleana* land. We are not prepared to say that in no case did the land commission, in making an award of title to land, expressly mention water rights, but in most cases at least no such mention was made even where such rights were undoubtedly intended to pass. Of course where a *kuleana* was described in an award as *kalo* or *loi* land it would be evi-

dence that the land was entitled by ancient custom to a supply of water for the cultivation of wet land taro, and the lack of such description would probably be evidence to the contrary, though not conclusive. The irrigation rights claimed by the petitioner are not those pertaining to the cultivation of wet land taro. The evidence is to the effect that there were a very few *lois* of taro in the locality in question. It was shown that the Hawaiians habitually raised in their house-lots dry land taro, bananas and vegetables as well as sugar cane which they cultivated for human consumption as well as for food for their animals. And it is a fair inference from the evidence that the ditch system at Waimea was constructed for the purpose of supplying water to the inhabitants for household purposes and for the irrigation, when the natural rainfall was insufficient, of their crops. It appeared in evidence that the capacity of the Akona ditch was between twelve and fifteen million gallons per twenty-four hours. The capacity of the Lyons ditch was not shown, but we infer from the testimony that it was not less than that of the Akona ditch. The other ditches were smaller. The quantity of water which flowed in these ditches either in former or recent times was not shown. The finding of the commissioner that it is impossible to decide upon the uncertain evidence what amount of water the lands of the petitioner were or are entitled to for irrigation purposes is affirmed. But it does not necessarily follow that, because of that fact, their right to irrigation water is to be denied. It is very difficult at this late day to show what quantity of water was used upon a particular parcel of land by ancient custom when it first became the subject of private ownership. Where the use of water upon land by ancient custom is shown by satisfactory evidence the right is not to be denied merely because the quantity has not been measured and cannot be proven. Counsel for the petitioner refers to

the case of *Hilo Boarding School* v. *Territory, supra,* where the court affirmed the decision of the water commissioner holding that the petitioner's land was entitled to a definite quantity of water though there was no direct evidence as to the quantity supplied at or before the date of its award, and it could be "only roughly approximated with a wide possibility of error." But in that case there was a well constructed ditch of known capacity and tangible evidence of the amount, within approximate limits, of the quantity of water which had flowed therein at different times, and the evidence showed a continuous use from a time antedating the award of the land. Here, the fact of variable and diminished use, though it did not constitute an abandonment, furnishes, in connection with the changed conditions at the Lyons intake, a potent element of uncertainty in an attempt to determine the quantity of water to which the several parcels of land are entitled. The preponderance of evidence showed that the supply of this ditch system on the southerly side of Waikoloa stream was augmented, as contended by the Territory, with an unknown quantity of water from Lanimaumau stream through Pelekuaiau pond the rights in which were not submitted for adjudication in this proceeding. There is testimony that on two occasions while the hearing was on the flow in the ditch from Pelekuaiau pond was measured and found to be about 910,000 and 870,000 gallons per day respectively. But it did not appear whether or not those were normal amounts for recent years or how they compared with the flow of former times. The commissioner was not required to base a finding as to quantity on mere conjecture, nor is this court.

Where ditches are shown to have been entitled by ancient use to take from a stream a definite proportion of the water normally flowing therein the same division is to be maintained in times of diminished flow. *Peck* v.

*Bailey, supra.* The rule is the same where the division is by time instead of proportion of the water. *See Yick Wai Co.* v. *Ah Soong,* 13 Haw. 378, 382. In that case, which was a contest between the owners on one ditch and those on another, the court said, "In times of drought the dam and ditch must remain in the same condition substantially as in times of plenty, and all must suffer accordingly." Large ditches which were constructed and have been used for the purpose of diverting a constant flow of water from a stream and distributing it among several parcels of land are to be regarded virtually as natural water-courses. This point was suggested, though not decided, in *Wailuku S. Co.* v. *Widemann, supra.* When nature diminishes the water supply the flow in one ditch may not be increased by artificial means to the detriment of the lands entitled to water from another ditch. In neither of the two cases just cited, however, was the application of the theory of proportional diminution to a permanently diminished supply involved, and the matter of loss by seepage and evaporation was not a prominent feature as it is in the present case. But under the rule that in a time of drought the dams and ditches must be permitted to remain in the same condition as in times of plenty, it would follow that if the flow of water in a stream is insufficient to reach the lower points of intake the owners furthest down would be entirely without water. The rights of the owners along a ditch are, as against the *ahupuaa,* "far more" than mere riparian rights. *Peck* v. *Bailey, supra,* at p. 661. Their right is to divert and consume— not merely to use and return. The general principle of proportional diminution applies as well to different lands along one ditch as between different ditches from the same stream. Hawaiian custom seems to have recognized this. In *Lonoaea* v. *Wailuku S. Co.,* 9 Haw. 651, 660, it was said, "The *konohiki* or head man of the land divided the water

in times of scarcity taking care that the kalo patches of the chief who held possession of the *ahupuaa* were filled first, and he endeavored to provide that all should have sufficient to keep his crop in condition." And in *Horner* v. *Kumuliilii*, 10 Haw. 174, 178, the court said, "When the quantum of water in the stream was diminished through drought he (the *konohiki*) saw to it that the quantity used by each was divided equally." But this rule of apportionment must be taken with some qualification for it cannot always be applied with full force as between the several owners along the line of a long ditch. In the case at bar the evidence tends to show that there has been so great a diminution in the normal flow of the stream that, after satisfying the primary right of the petitioner and individual respondents to water for domestic use, there remains a comparatively small quantity available for other purposes. The evidence tends further to show that for many years—forty or fifty years at least—there have been no persons living on the government land of Lalamilo below Lihue, and during that time no water for irrigation has been used thereon. It would be absurd to hold, therefore, that, because formerly, when there was an abundance of water, those lands were irrigated through branches from the Lyons and Akona ditches, the lands of the petitioner may not have the available water for irrigation, and to say that the flow in the ditches must not be materially diminished, even though, in the attempt to send a supply down to those distant lands, the entire flow should be consumed by seepage and evaporation. And the Territory could not convert the last right into a first right by taking the water out at a point far above to the detriment of the petitioner.

With reference to the land at Lihue some special points are to be considered. On behalf of the petitioner it is claimed that the evidence shows that at and for some years

prior to the grant of this land large quantities of water were used thereon for the irrigation of sugar cane and for the purpose of power as well as for domestic use.　The argument is that the amount of water then being used on the premises passed as an appurtenance with the grant of the land, and that as a grantor cannot derogate from his grant the government cannot now claim the right to divert water from the source of supply even for the purpose of supplying residents of the vicinity with water for domestic purposes.　The argument advanced on behalf of the Territory is to the effect that as government grants are construed strictly against the grantee, and nothing passes by implication, no water rights whatever passed with the grant of the land since no mention thereof was made in the instrument, and counsel draw a distinction between awards of land by and through the land commission, which it is conceded passed water rights by implication, and direct grants.　We do not sustain the contention of either counsel.　There is some question whether the land at Lihue, though stipulated to have been a part of Waimea, which was crown land, was itself crown land at the time it was granted.　The fact that it was granted by royal patent in the usual form, the purchase price going to the government, would indicate that it was not regarded as crown land at that time.　On behalf of the petitioner the argument is made that as the land was crown land, and as crown lands prior to the enactment of the statute of January 3, 1865 (see *Galt* v. *Waianuhea,* 16 Haw. 652, 655), were regarded and treated as the private lands of the king, though descending to his successors in office (see *Estate Kamehameha IV,* 2 Haw. 715) the conveyance is not subject to the rule of strict construction applicable to public grants.　And the further argument is made that the waters of the Waikoloa stream, being crown land waters, were subject to acquisition by prescriptive rights

through adverse user, and that such user was established by the evidence in favor of the land at Lihue. This last point would seem to be foreclosed by the decision in *Galt* v. *Waianuhea,* that the crown lands were not subject to adverse possession. But we think it is not necessary to enter upon a discussion of these matters. Under the view already expressed to the effect that these ancient ditches had, prior to the acquisition of private titles to the lands, become incorporated into the permanent topography of the country so as to become virtually natural watercourses, the right to water for both domestic use and irrigation, in accordance with ancient custom, passed with the conveyance of the land as an incident, like a riparian right at common law, though it was by public grant. 32 Cyc. 1036; *Union M. & M. Co.* v. *Ferris,* 24 Fed. Cas. (p. 595) No. 14371; *Cruse* v. *McCauley,* 96 Fed. 369, 374; *Sturr* v. *Beck,* 133 U. S. 541. The water right which passed with the grant of Lihue was not a superior right to a definite quantity. Like the rights which passed to lands awarded by the land commission, it was a right to such quantity of water as was customarily used on the land at and immediately before the date of the grant so long as that quantity continued to be available. The right did not attach as of the date the application was made by Macy and Louzada to the privy council for the purchase of the land, as held by the commissioner, for the application could have been withdrawn, the action of the privy council was merely advisory, and there is nothing to show that the amount of the purchase price was agreed upon prior to the date of the grant. This point is regarded by counsel as of some importance since it is claimed that the evidence shows that at the date of the application, October 15, 1850, water was being used upon the land for the irrigation of a considerable area of cane which was cultivated for the purpose of making into sugar, as well as for power to run

a sugar mill, though such use may have ceased prior to the date of the grant which was July 11, 1853. There was much conflict in the testimony as to when the sugar plantation ceased to exist. The commissioner made no finding as to the fact. According to one witness the plantation was in operation in 1858 or 1859, but we find from the weight of the evidence that it ceased prior to 1853. Kainapau and Kahue, the oldest *kamaaina* witnesses, agreed as to this. The former, called by the petitioner, testified that his marriage, which took place in the year 1852, was "long after" the cultivation of cane at Lihue had ceased; and the latter, a witness for the Territory, said that it ceased two or three years prior to 1853. And Nainoa, another witness for the petitioner, though he contradicted himself, said that the cane planting had ceased prior to 1853 which he identified as the year of the great small-pox epidemic. Testimony given by a few other witnesses was, inferentially at least, to the same effect. Kainapau further testified that Macy and Louzada did not plant a crop of cane but merely took off the crop which was growing when they took over the place from Abraham Fayerweather, and it is in evidence that Fayerweather left Lihue in 1847. From this it would seem that the plantation ceased operations probably not later than the year 1849. But the water system at Waimea was not put in for the purpose of irrigating sugar cane upon a commercial scale, and the evidence does not warrant the conclusion that such purpose was incorporated into the system so as to be made an integral part of the system. The evidence shows that following the closing down of the sugar plantation Macy and Louzada operated a slaughter-house at Lihue and salted beef. They advertised in a Honolulu newspaper printed on February 7, 1852, under a "Notice to Whalers," that they could be supplied at Kawaihae, Hawaii, with beef, mutton, hogs, potatoes, etc., and on July 1, 1854,

they advertised for sale "The stock farm at Lihue, Waimea." We hold, therefore, that the right to water for irrigation and other artificial purposes which passed with the grant to Macy and Louzada was not of the quantity which was at one time used in what seems to have been no more than an experiment in the attempt to grow cane on a commercial scale, but, as we have said, of such quantity as was being used at and immediately before the date of the grant. And that quantity was not permanently fixed but was subject to proportional diminution as in the case of other lands watered by the system (either *konohiki* or *kuleana*) in the event of drought or natural depletion of the general water supply. Furthermore, this right to water for artificial use is, in its nature, inferior to the primary right for domestic use.

It is well established at common law that the ordinary and natural use of water for household purposes, i. e., for drinking, washing, cooking, and for watering domestic animals, is a superior right to the use of water artificially, i. e., for mining, agricultural and commercial purposes. Gould on Waters (3d ed.) Sec. 205; 2 Farnham on Waters, Sec. 467. And we have no doubt that such is the law of this Territory. The ruling made in *Kaalaea Mill Co.* v. *Steward*, 4 Haw. 415, to the effect that where land has a water right the owner may use the water for any purpose he sees fit is not to the contrary. The question whether in case of diminished flow the right to water for artificial purposes would have to yield to the right for domestic use was not before the court in that case. We affirm the ruling made by the commissioner that the petitioner and the individual respondents, other than those against whom the order of default was entered, are entitled to water for domestic use, but not upon the ground upon which it was put. Section 471 of the Revised Laws, which was invoked by the commissioner, provides, *inter alia*, that

"Where the landlords have obtained or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood," etc., and "The people shall also have a right to drinking water, and running water, and the right of way." Those rights, as we understand it, are rights in gross which may be exercised by the lawful occupants of *kuleanas* or separated portions of an *ahupuaa* against the *ahupuaa* itself after it has passed into private ownership. Each owner would have the right to obtain water at the stream for his domestic use if his land is without an appurtenant right. A squatter upon an *ahupuaa* the title to which is in the government would have no legal rights under the statute, and a grantee of a portion of a government *ahupuaa,* such as a homesteader at Waimea, would have only such implied rights as, upon general principles, would pass as appurtenant to his land under the grant thereof. The Waimea homesteaders were not made parties to this proceeding, but it has not been suggested that their lots have any appurtenant water rights. The rights asserted by the petitioner and the individual respondents to water for domestic use were not claimed under the statutory provision, but are rights appurtenant or incident to their respective parcels of land. It is such appurtenant rights that these parties are entitled to.

While the Territory is the riparian proprietor both above and below the points at which water is diverted to the lands of the petitioner it is obvious that the diversion by it of water to sell to the homesteaders is not the exercise of its riparian right. Such use, though a highly beneficial one, is a new and different use which could not be exercised to the detriment of the pre-existing vested rights of others. The evidence showed that the maximum capacity of the Territory's pipe system is 700,000 gallons per twenty-four hours, and that the average quantity actually

taken and used has been about 570,000 gallons per day. With the exception of one occasion on which there was estimated to have been about 15,000,000 gallons of water flowing in the stream (an abnormal quantity for recent times) measurements made in the months of May, June and August, 1915, showed that the flow below the government dam averaged 1,045,000 gallons per twenty-four hours, such supply being available for the satisfaction of the primary rights of the lands of the petitioner and the individual respondents for domestic use. Leaving out of consideration the government land below Lihue, where there has been no cultivation for many years, and which is evidently beyond the reach of the present day flow available for artificial purposes, the surplus, after satisfying all rights for domestic use, would be available for irrigation on the lands of the petitioner. What quantity of water is required for domestic use on any of those lands was not shown by the evidence. Nor, as stated above, was it shown what quantity of irrigation water the lands of the petitioner were entitled to, though, we believe, the claims made by the petitioner in this respect are exorbitant. Under the ruling made by the commissioner that the individual respondents had lost by abandonment whatever rights they had to irrigation water—a ruling which we do not feel at liberty to review in the absence of appeals—those rights must be regarded as having reverted to the Territory, though here, as in the other instances, the evidence does not show what the quantity amounted to. Under all the circumstances it cannot be said that the diversion of the water by the Territory infringes upon the petitioner's right to irrigation water. And we further hold that as the maintenance, at the intake of the Lyons ditch, of the new concrete dam in place of the former rubble dam works no injury to the Territory it need not be restored to its original condition. *Wong Kim* v. *Kioula,*

4 Haw. 504; and see *Hilo Boarding School* v. *Territory, supra.* We think it must be obvious that this is as far as the court can go under the circumstances. It doubtless would be an advantage to the parties (particularly the petitioner) if the quantity of water to which the lands of the petitioner are entitled were determined. When, in a case of this kind, the evidence furnishes a reasonably definite basis for determining the quantity or the proportion of the normal flow of a stream or ditch to which certain land is entitled, either by time or quantity, it is proper for the court to make a definite adjudication in that respect. It has been held that water appurtenant to land for household purposes may be put to a different use; that water appurtenant to one piece of land may be used on another piece provided no one's rights are infringed by the change; and that improved methods for diverting water may be made use of upon like condition. Nevertheless the authority of the court is limited to ascertaining, determining, defining and enforcing proven rights. The weakness of the petitioner's case lay in the evident impossibility of showing with any reasonable degree of certainty what quantity of water the lands were entitled to by ancient use for artificial purposes. Under ordinary circumstances the burden of showing that a new diversion of water does not prejudice the right of another is upon the party who asserts the right to the new use, but where, as here, the extent of the right possessed by that other is not known to himself, and cannot be ascertained, the new use, if a beneficial one, ought not to be restrained upon merely conjectural grounds. If it should be made to appear in a future proceeding that the normal flow of the Waikoloa stream has become not more than enough to satisfy the primary right of the lands having appurtenant rights to take water for domestic purposes the further diversion of water by the Territory through its pipe system will have to be curtailed or suspended.

There remains to be considered only the claim of the petitioner to the right to storm or freshet waters of the Waikoloa stream on the *ahupuaa* of Ouli. Where a stream flows through a single *ahupuaa* it has been decided that as between the *ahupuaa* and *kuleanas* therein, or portions of the *ahupuaa* conveyed without rights to surplus water, the surplus waters of the stream belong to the *ahupuaa*. *Peck* v. *Bailey*, and *Haw. C. & S. Co.* v. *Wailuku S. Co.,* *supra*. The question here presented, as to the rights in the surplus waters of a stream which flows from one *ahupuaa* into another, is one of first impression. We think it must be settled according to the principles applicable to riparian rights at common law. That is to say, each *ahupuaa* is entitled to a reasonable use of such water, first, for domestic use upon the upper *ahupuaa,* then for the like use upon the lower *ahupuaa,* and, lastly, for artificial purposes upon each *ahupuaa,* the upper having the right to use the surplus flow without diminishing it to such an extent as to deprive the lower of its just proportion under existing circumstances. Gould on Waters (3d ed.) Secs. 206 et seq.; 3 Farnham on Waters, Sec. 600 et seq.

We hold therefore, that subject to the vested appurtenant rights of the petitioner and the individual respondents (who were not defaulted) to water for domestic use upon their respective lands, and subject further to the right of the petitioner to water for artificial purposes as below stated, the Territory is the owner of all the waters of the Waikoloa stream to the extent of the ordinary or normal flow; that the Territory lawfully maintains the dam and pipe system whereby it diverts water from the stream for the purpose of supplying the homesteaders and villagers of Waimea with water for domestic purposes not exceeding 700,000 gallons per twenty-four hours; that the lands of the petitioner and the individual respondents are en-

titled, in accordance with ancient custom, to water from the stream for domestic use; that the petitioner is entitled to the surplus normal flow, if any, after all domestic requirements are satisfied, for artificial purposes to the extent of the quantity to which the lands owned by him were entitled for such purposes by custom at the time the lands first passed into private ownership, whatever that quantity was; that the petitioner may maintain the concrete dam in its present condition at the intake of the Lyons ditch; and that the surplus flood and freshet waters of the Waikoloa stream are subject to the reasonable use of both the government and the petitioner as owners respectively of the *ahupuaas* of Waimea and Ouli, for the purposes and in the manner above stated.

A decree conforming to the foregoing views may be entered.

*W. B. Lymer* for petitioner.

*A. Perry* (*A. G. Smith,* Deputy Attorney General, with him on the brief) for respondent.