Selwyn A. ROBINSON, Eleanor Robinson, Russell S. Robinson, Ruth R. LeFiell, Marion R. Keat, Jean R. Weir, Selwyn A. Robinson, Eleanor Robinson, Bruce B. Robinson, Trustees under the Will of Aylmer F. Robinson, Helen M. Robinson, Individually and as Executrix, Estate of Lester B. Robinson, Bruce B. Robinson and Keith P. Robinson, Plaintiffs,

v.

George R. ARIYOSHI, Acting Governor, George T. H. Pai, Attorney General, Andrew S. O. Lee, Deputy Attorney General, Sunao Kido, Newton Miyagi, Larry E. Mehau, Manuel Moniz, Jr., Moses W. Kealoha and Hisao Munechika, Chairman and Members, Board of Land and Natural Resources, McBryde Sugar Company, Limited, Olokele Sugar Company, Limited, Ida Albarado, Helen B. H. Chu, Henry J. Chu, Chee Kung Fui Society, Lapaz Francisco, Marcellino Francisco, Albert K. Kaailau, Linda P. Kaiakapu, Ann N. Kali, Harriet U. Kano, Junichi Kano, Kiyoshi Kimata, Arnold W. F. Leong, Katherine A. Leong, Lo Sun D. Leong, Tai Hing Leong, Hanayo T. Naumu, Wallace A. Naumu, Hideo Nonaka, Hiromi Nonaka, Iwao Nonaka, Kazuo Nonaka, Masa-Toshi Nonaka, Shigekichi Nonaka, Takano Nonaka and Takao Nonaka (small owners), Defendants.

Civ. No. 74–32.

United States District Court,
D. Hawaii.

Oct. 26, 1977.

J. Garner Anthony, John H. R. Plews, Anthony, Hoddick, Reinwold & O'Connor, Honolulu, Hawaii, for plaintiffs.

Ronald Y. Amemiya, Atty. Gen., Andrew S. O. Lee, Deputy Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendants State Officials.

J. Russell Cades, Robert B. Bunn, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, for defendant McBryde Sugar Co.

William F. Quinn, Goodsill, Anderson & Quinn, Honolulu, Hawaii, for defendant Olokele Sugar Co.

Robert B. Bunn, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, Clinton I. Shiraishi, Shiraishi & Yamada, Lihue, Kauai, Hawaii, for Small Owners.

## DECISION

PENCE, District Judge.

Succinctly stated, the nominal plaintiffs, the Robinson family (hereinafter G & R), ask this court:

(1) To enjoin defendants Ariyoshi, Amemiya, et al. (State Officials), who are respectively the Governor, Attorney General, Deputy Attorney General, and Chairman and Members of the Board of Land and Natural Resources of the State of Hawaii (State), from interfering with the transportation and use of waters of the Hanapepe River (River) for irrigation purposes in the same manner and with the same property rights therein as existed prior to the holdings of the Supreme Court of Hawaii (Supreme Court) in *McBryde Sugar Company v. Robinson*, 54 Haw. 174, 504 P.2d 1330 (1973) (*McBryde I*), and *McBryde Sugar Company v. Robinson*, 55 Haw. 260, 517

P.2d 26 (1973) (*McBryde II*), viz., that the right to running water could not have been and was not transferred into private ownership by the mahele and that therefore the "State is the owner of all the water" in the River; [1]

(2) For a declaratory judgment that the decision of the Supreme Court in *McBryde I* is void and without effect to the extent that (a) it adjudicated the normal surplus water of the River to be the property of the State, subject only to appurtenant water rights (a claim never made by the State); (b) it adjudicated that rights to ancient appurtenant water cannot be separated from ownership of the land and can only be used on the land to which it was originally appurtenant; (c) it adjudicated that with respect to water awarded to them, neither McBryde nor G&R, nor any of the plaintiffs, may transport that water out of the watershed; and (d) that the English common law doctrine of riparian rights is the law governing the use of Hawaii's stream waters.

Also named as "defendants" were McBryde Sugar Company (McBryde), Olokele Sugar Company (Olokele) and Albarado, Chu *et seq.* (Small Owners). These nominal defendants in fact seek the same general relief against the State Officials as do G&R and, for purposes of this decision, unless particularly identified hereafter, they will herein be included with G&R in the term "plaintiffs" as distinguished from the nominal plaintiffs G&R. Olokele filed a cross

claim against McBryde, the State Officials and the Small Owners, alleging that the decision in *McBryde I*, although not yet actually implemented by the State Officials, casts doubt upon the validity of its lease with G&R, seeking determination of its rights in and to the waters. McBryde also filed a counterclaim against G&R and the State Officials seeking a determination of its rights in and to the waters. The Small Owners also filed a similar counterclaim against the State Officials. All plaintiffs seek a permanent injunction against the State Officials interfering with their rights.

All plaintiffs claim that the judgment of the Supreme Court was entered (a) without subject matter jurisdiction and (b) with neither procedural nor substantive due process being given to the plaintiffs, in violation of the Constitution and statutes of the United States. This court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, 2283, and 42 U.S.C. § 1983. As appears hereafter, the amount in controversy far, far exceeds $10,-000.

*Background*

In 1959, this case started like gentle tradewinds—each of the plaintiffs and the State claiming certain rights to and in the waters flowing down the River, in accordance with what each of the parties, including the State, thought was the well settled water rights law under Hawaiian statutes and decisions. McBryde filed its complaint

---

1. As used in this decision, the terms relating to Hawaiian surface water law are used in accordance with the usage developed in State decisions over a period of a century as follows:

(1) "Appurtenant" water denotes water anciently utilized (principally for taro cultivation);

(2) "Prescriptive" water denotes water rights which are acquired by usage under claim of adverse possession;

(3) "Normal" surplus water denotes water over and above that needed for the satisfaction of appurtenant and prescriptive water rights and inhering in the ownership of the *ahupuaa* or *ili kupono* on which the stream originates;

(4) "Storm and freshet" surplus water denotes water in excess of normal surplus water which is intermittently caused by storm precipitation;

(5) The term "Hanapepe River" includes the Koula and Manuahi streams which join to make the Hanapepe River.

See generally, *Territory v. Gay*, 31 Haw. 376, 383–84 (1930), *affirmed*, 52 F.2d 356 (9th Cir. 1931), *cert. denied*, 284 U.S. 677, 52 S.Ct. 131, 76 L.Ed. 572 (1931); *Carter v. Territory*, 24 Haw. 47, 70–71 (1917); W. Hutchins, The Hawaiian System of Water Rights, *passim*, analyzing all the Hawaiian decisions (1946) (Pl.Ex. 10); Report of the Water Commission of the Territory of Hawaii (Act 36 Legislature of 1915) (Ex. M-Fed.–3, pp. 9 & 20); Hawaiian Water Authority report "Water Resources in Hawaii", March 1959 (Ex. M-Fed.–4, pp. 63–65); Report to the House Committee on Interior and Insular Affairs, 83d Congress on the Territorial Irrigation Program in Hawaii by Hawaii Irrigation Authority, Dec. 13, 1954 (Ex. M-Fed.–16, pp. 7 & 8).

on March 4, 1959 against the State, Olokele, Small Owners, etc., in the Fifth Circuit Court (Kauai) for determination of the appurtenant and prescriptive water rights of the parties and their rights to storm and freshet water in the River. No one, not even the State, raised any question about the severability of water rights from the riparian lands along the River, or the right to transport the River's waters for use out of its watershed. Nor was any question raised about the rights of the parties to the normal flow of surplus waters of the River (excepting only certain claims of rights therein acquired by prescription). All parties took for granted that these rights were solidly embedded in the law of waters of Hawaii. No one even mentioned the possible application of the English common law doctrine of riparian rights to Hawaiian waters.

The trial lasted from May 5 through August 17, 1965, and produced a record of 3,483 pages plus voluminous documentary exhibits. The trial judge's amended decision was filed January 30, 1969. In it he delineated the rights of the parties with respect to appurtenant water, prescriptive water, normal surplus water, and storm and freshet surplus water in the River.

All parties and the trial court accepted as unquestionably settled water rights law in Hawaii (1) that all normal surplus water belongs to the *konohiki* of the *ahupuaa* or *ili kupono*[2] on which it originates, (2) that water rights are severable from riparian lands and may be freely transferred to any land, within or without the watershed upon

which they arose, subject only to the water rights of others in the same waters, and (3) that water rights may be obtained by prescriptive use.

Only McBryde, G & R and the State appealed, their appeals concerning, primarily, the trial judge's rulings on appurtenant and prescriptive water rights,[3] as well as the use of storm and freshet surplus water. The Supreme Court in *McBryde I* (a) upheld the trial court's adjudication of the appurtenant water rights of the State, McBryde and the Small Owners; (b) affirmed in part and reversed in part the adjudication of G&R's appurtenant rights; and (c) reversed the adjudication of McBryde's prescriptive rights.

Then, ignoring both H.R.S. § 602–5(1),[4] and its own Rule 3(b)(3),[5] the Supreme Court decided, sua sponte, without warning to any of the parties nor argument from them (a) that the State owned all the waters of the River, be they normal,[6] storm or freshet, subject only to appurtenant riparian rights under English common law doctrine of riparian rights, which doctrine was declared to apply to all flowing surface waters of the State; (b) that there was no surplus water in any stream in the State—the State owned all flowing water; and (c) that neither G&R nor McBryde had any right to divert their appurtenant waters of the River outside its watershed.

As Justice *Marumoto* said in dissent: "That decision has no relation whatsoever to the judgment appealed from * * * and is neither within the issues raised and

---

2. The terms "*ahupuaa*" and "*ili kupono*" denote units of land. These terms, as well as the term "*konohiki*" are more fully defined in Justice Levinson's dissent in *McBryde II*.

3. The earlier Hawaiian cases made no distinction between the terms "appurtenant" and "prescriptive" water rights inasmuch as initially there was no law pertaining to acquiring title by adverse use. It was not until the Limitation of Actions Act of 1870 that adverse use for a period of 20 years enabled one to claim property as of right. Thereafter the term "prescriptive" was used as indicated in n. 1(2), *supra*.

4. § 602–5 Jurisdiction and Powers. The Supreme Court shall have jurisdiction and powers as follows:

   (1) To hear and determine all questions of law, or of mixed law and fact, which are properly brought before it from any other court * * *.

5. Rule 3 Briefs (b) Opening Brief. Within 60 days after filing of the record on appeal, the appellant shall file an opening brief containing * * * (3) A short and concise statement of the * * * questions presented for decision * * *. Questions not presented according to this paragraph will be disregarded * * *.

6. See n. 1, *supra*.

tried in the circuit court nor within the questions presented and argued to this court." *McBryde I*, 54 Haw. at 201, 504 P.2d at 1346.

The majority's rationale in *McBryde I*, for these completely revolutionary holdings was grounded entirely on (1) a specific portion of the Principles Adopted by the Board of Commissioners to Quiet Land Titles in Their Adjudication of Claims Presented to Them, adopted by the Land Commission on August 20, 1846 and approved by resolution in the Legislative Council on October 26, 1846, RLH 1925, Vol. II, 2124, 2128 (originally enacted as L.1847, at 81, 85) (hereinafter Land Commission Principles), which announced that the mahele left unimpaired the King's power "to encourage and even to enforce the usufruct of lands for the common good", *id.* at 186, and (2) § 7 of the Enactment of Further Principles (hereinafter Further Principles), originally published as L.1850, § 7, at 202, and presently compiled in HRS § 7–1, which, the court held, codified the doctrine of riparianism as it existed in Massachusetts and England in the mid-nineteenth century, and that under that doctrine water rights acquired by virtue of ownership of lands along the bank (*ripa*) of a stream or river were appurtenant exclusively to those parcels of land and could not be transferred to remote parcels. *Id.* at 191–98.

When all parties (except the State), including the non-appellant Small Owners and Olokele, petitioned for a rehearing, the court permitted G&R, McBryde and the Small Owners to address themselves only to two issues:

1. The pertinent portion of HRS § 7–1, which was first enacted on August 6, 1850, Laws 1850, and which has been in our statute books ever since, reads:

"The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and watercourses, which individuals have made for their own use."

Is the foregoing statute material to the determination of the water rights of the parties in this case? If so, why, if not, why?

2. The parties in this action introduced evidence as the record shows, to show that parcels of land in the Hanapepe Valley were entitled to appurtenant water rights for raising taro at the time of the Mahele or the Land Commission Award. The trial court found certain parcels were entitled to appurtenant water rights. Under what principle or theory of law are the owners entitled to apply the appurtenant water rights to parcels of land other than that to which the court found the right was appurtenant? *McBryde II*, 55 Haw. at 268, 517 P.2d at 30.

Although those parties asserted constitutional grounds for reversal of *McBryde I* in their petitions for rehearing, the majority (three justices) in *McBryde II* refused to consider the same and summarily and most tersely, in a completely unenlightening per curiam opinion, held: "After careful consideration of the briefs and arguments presented at the rehearing, we find no reason to change the decision filed herein." *Id.* at 261, 517 P.2d at 27.

Justice Marumoto again dissented. Justice Levinson also dissented, and, in probably the finest opinion of his judicial career, made such a detailed, enlightening and convincing analysis of "long established and unique principles of Hawaiian water law," *id.* at 268–298, 517 P.2d at 27, that this court in substance adopts his analysis of those principles as a component part of its own decision.[7]

---

7. This court will not therefore, herein reiterate and reanalyze the judicial decisions of *Peck v. Bailey*, 8 Haw. 658 (1867); *Kaalaea Mill Co. v. Steward*, 4 Haw. 415 (1881); *Kahookiekie v. Keanini*, 8 Haw. 310 (1891); *Lonoaea v. Wailu-* ku *Sugar Co.*, 9 Haw. 651 (1895); *Horner v. Kumuliili*, 10 Haw. 174 (1895); *Wong Leong v. Irwin*, 10 Haw. 265 (1896); *Cross v. Hawaiian Sugar Co.*, 12 Haw. 415 (1900); *Haw. Comm. & Sugar Co. v. Wailuku Sugar Co.*, 14 Haw. 50

*Analysis of the Majority Opinion*

A review of the authorities cited in note 7, *supra,* shows, beyond even a shadow or a doubt, that before *McBryde I* pre-Captain Cook Hawaiians had transported surface water out of its watersheds; that Kamehameha himself, before he had conquered the islands, in his native Kohala homelands similarly diverted water; that those justices of the Supreme Court of the Kingdom, when the Hawaiian language was dominant over the English, and when the justices were personally familiar with the events and principles giving birth to the Great Mahele, likewise stated, as appears in *Peck v. Bailey, supra* n. 7, 8 Haw. at 671, in 1867, Allen, C. J.:

> [I]rrigation early claimed the attention of the cultivators of the soil on these islands, not only from the fact of its being a necessity on most of the land, but from the fact that [taro raising] * * * required flowing water, and hence in all portions of these islands the traveler will see evidence of ancient water courses * * *. The water courses [in the ahupuaa involved in the case] have existed from time immemorial and were doubtless made by the order of some ancient King, and when the late King [Kamehameha III] conveyed these lands to the proprietors [pursuant to the Principle of the Great Mahele] the rights of the water courses, in their full enjoyment, was included as an appurtenance. While the King owned this Ahupuaa, he had a right to apply the water to what land he pleased, but after the water courses were made, * * * his conveyance of land bordering on the Wailuku river will in-

clude the rights of water in said river, which had not been before granted.

In the following paragraph Chief Justice Allen states:

> The kula land of the defendant has no riparian rights, and it does not appear * * * that it has any prescriptive rights of irrigation * * *. There is no doubt that the law which regulates the use of water would be somewhat different in tropical countries from that in a northern latitude.

One hundred six years after *Peck,* the Supreme Court dismissed Chief Justice Allen's conclusions of law as "dicta" and the court itself undertook to "review the Great Mahele and the laws which implemented" it. *McBryde I,* 54 Haw. at 184, 504 P.2d at 1337. The court then determined that because (a) the King had not conveyed "his sovereign prerogatives as head of the nation", one of which was the prerogative: "3rd. To encourage and even to enforce the usufruct of lands for the common good" and (b) the court "believe[d] that the right to water is one of the most important usufruct of lands", therefore "the right to water was specifically and definitely reserved for the people of Hawaii for their common good in all of the land grants." *Id.* at 186, 504 P.2d at 1338.

Thusly did the court "proceed to spit the victim for the barbecue",[8] and held that neither McBryde nor G&R owned the water of the River; the State owned it!

But the court was not through with its culinary creations. It held that while "appurtenant water right to taro land attached to the land when title was confirmed" under the mahele, nevertheless, because "the

---

(1902) and 15 Haw. 675 (1904); *Palolo Land & Imp. Co. v. Wong Quai,* 15 Haw. 554 (1903); *Kaneohe Ranch Co. v. Kaneohe Rice Mill Co.,* 20 Haw. 658 (1911); *In Re Taxes Waiahole Water Co.,* 21 Haw. 679 (1913); *In Re Taxes Hui of Kahana,* 21 Haw. 676 (1913); *McBryde Sugar Co. v. Andrade,* 22 Haw. 578 (1915); *Hilo Boarding School v. Terr. of Hawaii,* 23 Haw. 595 (1917); *Carter v. Territory,* 24 Haw. 47 (1917); *Foster v. Waiahole Water Co.,* 25 Haw. 726 (1921); *Territory v. Gay,* 26 Haw. 382 (1922) (*Gay I*); *Territory v. Gay,* 31 Haw. 376 (1930), *affirmed,* 52 F.2d 356 (9th Cir. 1931),

*cert. denied,* 284 U.S. 677, 52 S.Ct. 131, 76 L.Ed. 572 (1931) (*Gay II*) or the studies, texts and reports of J. Chinen, W. Hutchins, H. A. Wadsworth, R. Kuykendall, A. Day, the Water Commission of the Territory of Hawaii to the Governor (1917), Attorney General C. R. Hemenway (1908), L. Teclaff, or E. S. Handy and E. G. Handy. Justice Levinson has already most carefully, completely and accurately done that.

8. Llewellyn, K., The Common Law—Deciding Appeals 364.

use of the word 'appurtenant' [citing Webster's Dictionary] indicates * * * water rights which [are] * * * annexed to that particular parcel of land conveyed by the original grant * * * the right to the use of water [so] acquired * * * may only be used [on the] * * * particular parcel of land to which the right is appurtenant and any contrary indications in our case law are overruled." Thereby all of the case law and literature cited in note 7, *supra*, were dumped into the glowing coals. "Thus, neither McBryde nor Gay & Robinson may transport [their appurtenant] water to another watershed * * *." *Id.* at 190–91, 504 P.2d at 1345. (footnote omitted).

The court then withdrawing a sliver of dicta from the now burning *Territory v. Gay* (*Gay II*), *supra* n. 7, 31 Haw. at 395: "Water for domestic purposes * * * is in any event assured under Hawaiian law", decided that "the right to domestic water * * * was * * * the right guaranteed in 'Enactment of Further Principles,' enacted by the Hawaiian Government on August 6, 1850," viz., "The people * * * also shall have a right to drinking water, and running water, and the right of way." The court then basted the sizzling plaintiffs: "the term 'running water' must mean water flowing in * * * streams and rivers. We also believe that the right to 'running water' * * * guarantees a land owner the same flow of water in a stream * * * as at the time of the mahele, without substantial diminution," *i. e.*, "in the form and size given it by nature." *McBryde I*, 54 Haw. at 191–93, 504 P.2d at 1342.

The court next proceeded to reason that because many of the missionaries had come from Massachusetts, bringing that state's law with them, law which was founded on English common law, therefore the right guaranteed in the Further Principles, *supra*, "was * * * a statutory enactment of the doctrine of riparian rights" as construed under the Massachusetts and English common law! Then and thereby the court gave to McBryde, G&R and the Small Owners the right to divert water on to their taro patches, then return it to the River and thereafter watch and enjoy the sight of the waters of the River flowing down to sea. *Id.* at 197, 504 P.2d at 1344.

McBryde's claims to any prescriptive rights in the water were also summarily disposed of: since the State owns all the water, no prescriptive or adverse use rights can ever be claimed against the State. The court, giving lip service to the doctrines of res judicata and stare decisis, held that "the rule of *Terr. v. Gay* * * * is binding on the State in this case." *Id.* at 179, 504 P.2d at 1335. Nevertheless G&R's claims to "normal daily surplus water" along with "storm and freshet waters" also went into the same coals. Since *Gay II* "was based upon the assumption that there would be * * * 'normal daily surplus water' after the water rights of all [other owners had been determined]," since both the State and McBryde owned lands below G&R along the River, and each was entitled to have the River flow "in the shape and size given it by nature" and that amount had never been determined—"thus, there can be no * * 'normal daily surplus water,' and Gay & Robinson is entitled to [no water] under" *Gay II*. *Id.*, 54 Haw. at 199, 504 P.2d at 1345.

The barbecue was done!

From the manner in which the court wrote the majority opinion in *McBryde I*, it was obvious that the court determined, without notice to any party of its intent, that it was going to completely restructure what was universally thought to be the well settled law of waters of Hawaii. The court sua sponte decided that all the flowing waters of the streams in the State should belong entirely to the State, subject only to appurtenant use under the English common law doctrine of riparian rights. It was strictly a "public-policy" decision with no prior underlying "legal" justification therefor. The majority wanted to see streams running down to the sea on an all-year-around basis. Knowing that this was squarely contrary to the accepted state of water rights law of Hawaii, the court first

declared that the rule of stare decisis did not apply to water rights law. In this case stare decisis interfered with the court's policy!

The precedent used by the court for overthrowing the entire line of cases and authority set out in note 7, viz., *Helvering v. Hallock*, 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940), was, as pointed out by Justice Marumoto in *McBryde I*, not sound authority on the facts for the result the court had decided it was going to achieve. *Helvering* did not concern real property— nor water—nor did it bring about a violent dislocation of the accepted law and virtually complete disruption of the established agricultural system of the state. Moreover, the portion quoted was incomplete. The entire sentence read: "But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision [here is as far as *McBryde I* wanted to quote, and so stopped], however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *McBryde I*, 54 Haw. at 180, 504 P.2d at 1335. The very doctrine which *McBryde I rejected* was by virtue of having been tested in law and in fact for over a century and a half *more embracing in its scope, intrinsically* found to be *sounder* by Hawaii's kings, jurists, legislators and businessmen, and *verified by* actual *experience* with the results of the doctrine.

The speciousness of the reasoning of the majority for such overthrowing is well illustrated by the method in which it held that "the right to water was specifically and definitely reserved for the people of Hawaii for their common good. *Id.* at 186, 504 P.2d at 1338. The court's syllogism went somewhat thusly: The function of the Land Commission was to investigate and pass on all claims to land in the Hawaiian Kingdom and the Commission adopted certain principles in 1846 which were approved by resolution of the legislature provided that "all claims for landed property * * * shall be tested by those principles, and according to them be confirmed or rejected." *Id.* at 185, 504 P.2d at 1338. By those principles

the Commission was to convey the King's "private or feudatory right * * * not his sovereign prerogatives as head of the nation." *Id.* at 186, 504 P.2d at 1338. Since the 3rd prerogative "to encourage and even to enforce the usufruct of lands for the common good" and the right to water is an important usufruct, therefore "to encourage and * * * enforce the usufruct of lands" meant that the King *reserved* all of the water for the Kingdom; the owners of the *ahupuaas* and *ilis kupono* acquired no vested interest in the streams contained within their lands.

If the court's logic were to continue, then it was not until the Enactment of Further Principles (later § 577 RLH 1925) three years later that the owners of the lands acquired any rights whatsoever to water. That Act, according to the 1976 interpretation of the court's majority, meant that for the first time in three years the owners of the land had the right to drinking water and running water and rights of way. In holding that the Enactment of Further Principles made it "crystal clear that the statute reserved to land owners the right to both 'drinking water' and 'running water'", *id.* at 192, 504 P.2d at 1342, the court completely bypassed the fact that the section was never meant to apply to the general public or to general land owners' rights! The heading of the section, with greater crystal clarity, shows that it was intended to apply to "Building materials, water, etc.; landlords' titles subject to tenants' use." *Id.* at 192, n. 17, 504 P.2d at 1341. The statute was never intended to apply to the general public or reserve anything for the "people" of the Kingdom. It was solely aimed at giving to the *hoaainas*, as former tenants at sufferance but now owners in fee of a *kuleana* within an *ahupuaa*, the right to take firewood, house-timber, thatch, etc., "*from the land on which they live*, for their own private use * * *. The springs of water, running water, * * shall be free to all [*hoaainas*], on all lands granted in fee simple." *Ibid.* (emphasis added).

The statute obviously applied only to the rights of the tenants vis-a-vis their former landlords, and Justice Robertson, in *Oni v. Meek*, 2 Haw. 87, 96, in 1858, upon analyzing the meaning of this very section held that the word "people" as used therein was "synonymous with the term *tenants*" (emphasis in original). Nevertheless the court unrestrictedly leaped over that obvious fact and the ancient law thereon and concluded that by those simplistic words the English common law rule of riparian rights was engrafted into the Hawaiian law. Manifestly the court had paid no attention to the statement of Justice Robertson in *Kake v. C. S. Horton*, 2 Haw. 209, 211 (1860):

> It is argued by counsel for the defendant, that the Common Law of England is in force in this Kingdom, and that therefore the action cannot be maintained in this Court. In our opinion, this argument is not sound. We do not regard the Common Law of England as being in force here *eo nomine* as a whole. Its principles and provisions are in force so far as they have been expressly, or by necessary implication, incorporated into our laws by enactment of the Legislature; or have been adopted by the rulings of the Courts of Record; or have become a part of the common law of this Kingdom by universal usage; but no farther.

The entire rationale of the majority is one of the grossest examples of unfettered judicial construction used to achieve the result desired—regardless of its effect upon the parties, or the state of the prior law on the subject.

Although, as indicated above, the English common law doctrine of riparian rights had never been raised by any of the parties—not even the State—the Supreme Court lifted out of context the Statement of Chief Justice Perry in *Gay II, supra*, 31 Haw. at 395:

> Water for domestic purposes on a lower ahupuaa is in any event assured under Hawaiian law. Every portion of land, large or small, ahupuaa, ili or kuleana, upon which people dwelt was, under the

ancient Hawaiian system whose retention should, in my opinion, continue unqualifiedly, entitled to drinking water for its human occupants and for their animals and was entitled to water for other domestic purposes. At no time in Hawaii's judicial history has this been denied.

The court then rhetorically asked itself: "Now what is this Hawaiian law or ancient Hawaiian system mentioned in the decision?" *McBryde I*, 54 Haw. at 191, 504 P.2d at 1341. Next the court, arguing for itself, stated:

> [T]he term 'running water' must mean water flowing in natural watercourses, such as streams and rivers. We also believe that the right to "running water" as contained therein guarantees a land owner the same flow of water in a stream or river as at the time of the mahele, without substantial diminution, or the right to flow of a stream in the form and size given it by nature. This right may be in connection with his right of laundering, canoeing, swimming, bathing, etc. *Id.* at 192–93, 504 P.2d at 1342.

Finally the court determined that the reason such "law" was enacted was because the missionaries, "many of whom came from Massachusetts, * * * brought with them the English common law as recognized in Massachusetts." *Id.* at 193, 504 P.2d at 1342. The court continued then to analyze the Massachusetts and English law of waters and concluded:

> It would appear that in the light of history and historical background of the Hawaiian Kingdom, the provision of the law enacted in August 6, 1850 which reserves to property owners the "right to drinking water and running water," was a codification or statutory enactment of the doctrine of riparian rights recognized as part of the common law by the English and Massachusetts courts. *Id.* at 197, 504 P.2d at 1344. (footnote omitted).

Contrary to the Supreme Court's conclusatory assumption that it was the missionaries who engrafted Massachusetts common

law upon Hawaiian, it was John Ricord,[9] Hawaii's first lawyer who, after being appointed attorney general in 1844, drafted the three Organic Acts of 1845–47, i. e., to Organize (1) the Executive Ministry, (2) the Executive Departments, and (3) the Judiciary Department.

William L. Lee [10] was Hawaii's second lawyer, who in August 1847 was appointed president of the Board of Commissioners to Quiet Land Titles and a month later, in September 1847, was appointed to the Privy Council. It was he who presented to the Privy Council details for the plan for actual division of the lands in The Mahele.

In 1850 Elisha H. Allen,[11] the third lawyer, arrived as American counsel and in September 1853 was appointed minister of finance. In 1857, Allen became Chief Justice of the Supreme Court of Hawaii.

Ricord, Lee and Allen, to be sure, were all educated in Massachusetts and New York. They were thus very familiar with the English common law. In writing and making the law for the Kingdom of Hawaii, however, each of them followed out the Resolution of the legislature of September 27, 1847, i. e., that the laws of Hawaii should be "adapted to the wants and conditions of the Hawaiian Nation." Thus Lee, in preparing the Criminal Code, acknowledged his indebtedness to those who had prepared a penal code for Massachusetts (Common Law) "and also to those of Mr. Livingston in the penal code of Louisiana [Code Napoleon]. From both * * * I have borrowed largely." And Judge Lee concluded, "My chief aim has been to be so brief, simple and direct, in thought and language, as not to confuse the native, and yet so full as to satisfy his increasing wants, together with those of the naturalized and unnaturalized foreigner." [12]

The Supreme Court in 1976, therefore, could not with integrity dismiss Chief Justice Allen's statements as to the ancient Hawaiian law of waters as dicta. Chief Justice Allen in 1862 was far, far more familiar with the Hawaiian "principles" and the customs, practices and laws of the Hawaiian Kingdom than were the justices of the Hawaii Supreme Court over 100 years later.

As appears from the wording of the statute relied on by the Supreme Court, neither Ricord nor Lee nor Allen directly used the Massachusetts common law in drafting the Kingdom's first codes. And Allen, as shown by his opinion in Peck, supra, founded his decision upon the Hawaiian practices and customs—not solely upon the English common law.

The Supreme Court summarized its decision thusly:

VIII. SUMMARY

1. As between the State and McBryde, and McBryde and Gay & Robinson, the State is the owner of the water flowing in the Koula Stream and Hana-

9. John Ricord was educated in New York but thereafter practiced in Louisiana, Texas, Arizona, Florida and Oregon, before coming to Hawaii. He arrived February 27, 1844 and was appointed attorney general of the Kingdom on March 9, 1844. It was he who suggested the enactment of the "Principles" before the legislative body on May 21, 1845.

10. William L. Lee was born in New York in 1821; educated at Harvard University; and in 1844 commenced the practice of law at Troy, New York, having been admitted to practice before the Supreme Court of the State of New York. Lee arrived in Honolulu (presumably on his way to Oregon) on October 12, 1846. At the age of 26, in 1848, Judge Lee was elected Chief Justice of the new Superior Court.

11. Chief Justice Allen was born in New Salem, Massachusetts, in 1804; educated at Williams College; practiced law in Vermont, Maine and Massachusetts from at least 1835 to 1848; and served in the legislatures of both Maine and Massachusetts, as well as having been a United States Congressman from Maine to the 29th U. S. Congress. He was appointed U. S. Consul to Hawaii in 1849 and arrived in Hawaii in 1850. He was appointed Minister of Finance of the Hawaiian Kingdom in 1853, and in 1857 was appointed Chief Justice of the Hawaii Supreme Court, serving as such until 1877. From 1863 until his sudden death on January 1, 1883, he also served as the Hawaiian Minister to Washington.

12. Dutton, Meiric K., William K. Lee Hawaii's First Chief Justice & Chancellor of the Kingdom 22.

pepe River. However, the owners of land, having either or both riparian or appurtenant water rights, have the right to use of the water, but no property in the water itself.

2. The State, McBryde and Gay & Robinson have both appurtenant and riparian rights to water in connection with land within Hanapepe Valley. However, under claim of such rights, neither McBryde nor Gay & Robinson may transport water to another watershed.

3. Under the doctrine of riparian rights, owners of land adjoining a natural watercourse have the right to a flow of a river or stream in the shape and size given it by nature. Thus, under such right there can be no "normal daily surplus" water.

4. McBryde has no prescriptive right to water, as no one may claim title or interest against property owned by the State.

5. "Storm and freshet" water is the property of the State.

Neither McBryde nor Gay & Robinson has any right to divert water from the Koula Stream and Hanapepe River out of the Hanapepe Valley into other watersheds.

The immediate and obvious impact on the parties was:

1. "Water rights" which, as private property had been bought, sold and leased freely, and which had been the subject of taxation as well as condemnation, were for all practical purposes rendered worthless.

2. G&R and Olokele, which had expended almost $1 million in building an extensive water transportation system for irrigation of their sugar lands, found their system made unusable and much of their cane lands destined to become pasture. McBryde was destined to suffer the same fare.

Thousands of acres of sugar and other agricultural lands on almost every major island would be exposed to the same fate, even though the owners were not parties to the suit.

The State acquired, free of charge, all of the running waters of the State, subject only to the rights of riparian owners of land under the common law doctrine of riparian rights.

As indicated above, the Supreme Court, on rehearing, paid no attention to plaintiffs' challenge to the constitutionality of its decision, even though this was raised in plaintiffs' briefs on their application for rehearing. The constitutionality of that decision, then, becomes the basic question now before this court for determination.

*FINDINGS OF FACT*

Turning now to the trial before this court, and based on the record, including all prior proceedings in *McBryde v. Robinson*, the pleadings, evidence adduced, exhibits, stipulations, requests for admission, and answers to interrogatories, the court finds:

1. The Findings of Fact of the trial court consisting of Findings 1 to 65 (Plaintiffs' Exhibit 7, pp. 7 to 49), none of which were modified on appeal by the Supreme Court, are adopted as facts in determining the constitutional and other federal claims before this court.

2. In the Pretrial Order entered on March 4, 1965 in *McBryde* approved by the State, McBryde and G&R, it was admitted that G&R were "the owners of the ilis kupono of Koula and Manuahi, that plaintiff (McBryde) is the owner of the ilis kupono of Eleele and Kuiloa and that the State is the owner of the ahupuaa of Hanapepe." (Answer to Request No. 4 of G&R for Admissions)

3. The ownership of the normal surplus water of the Koula Stream which flows into the River was admitted in the proceedings in *McBryde* to be the property of G&R and at no time did the State or any other party deny or dispute G&R's right to take the normal surplus water so owned out of the River and to transport the same to Makaweli. (Answer to Requests Nos. 6, 7 and 8 of G&R for Admissions)

4. At no time prior to the entry of the judgment by the Supreme Court in

*McBryde I* did any party dispute or deny the right of any other party to transport any water which he might own by "appurtenant", "prescriptive" or "normal surplus" right for use on lands other than those from which those rights originated, and to sell or lease such rights separate from the lands from which such rights originated. (Answer to Request No. 10 of G&R for Admissions) [13]

5. In the trial of *McBryde*, the State conceded that McBryde was entitled to the appurtenant water rights of LC Aw 7928 Apanas 1 and 2 to Maluaikoo, LC Aw 10010 to Makahiki, LC Aw 10526 to Naloheelua and LC Aw 19–B to Kanehiwa, although McBryde had no title or interest other than said water rights in said lands. (Answer to Request No. 11 of G&R for Admissions, Conclusions contained in "Court Exhibit 1", Pl.Ex. 7, pp. 39–43)

6. In the *McBryde* trial the State claimed and was awarded by the judgment of the Fifth Circuit Court the appurtenant water rights of 0.26 acres of land in Grant 11149 (formerly Government Lot 6B) and of 0.14 acres of land in Grant 10832 (formerly Government Lot 54B), although the State had no title or interest other than said water rights in said lands. (Answer to Request No. 12 of G&R for Admissions)

7. The only issues of fact or law tried in *McBryde* in the Fifth Circuit Court were (1) the identity and extent of privately or publicly owned land having appurtenant water rights, and privately or publicly owned water rights owned separately from land, (2) the quantity of water attributable to the identified water rights, (3) McBryde's claim by adverse possession against G&R to prescriptive water out of G&R's normal surplus water and the quantity of such prescriptive water, and (4) the claims of the State, McBryde and plaintiffs to a division of the storm and freshet surplus. (Answer to Request No. 13 of G&R for Admissions and transcript, Pl.Ex. 1, p. 99 *et seq.*) [14]

8. Following the Supreme Court opinion in *McBryde I*, timely petitions for rehearing were filed by McBryde and by G&R (Pl.Ex. S.C.–62 and S.C.–65) and a "Motion for Partial Vacation of Opinion and for Opportunity to Present Evidence and Argument" was filed by Olokele, its *first* active appearance in the appeal to the Supreme Court (Pl.Ex. S.C.–59) which was promptly denied (Pl.Ex. S.C.–60). The two petitions and the motions contended *inter alia* that the transformation of private property (without claim having been made therefor by the State) into public property and by judicial process, without compensation to those whose property was so taken, violates due

13. In *Gay II*, 31 Haw. at 398 et seq., Chief Justice Perry discussed the inappropriateness and "unsuitability" of the riparian system to conditions in Hawaii in general and in Hanapepe in particular; " * * * our largest and most fertile tracts of land are not riparian and would have no water and no agricultural development under that system * * * under the Hawaiian system the water appurtenant to each land belongs to the owner of the land, it was severable therefrom and was transferable * * * to other lands * * * riparian or nonriparian * * * . There was no limitation in favor of lands within the same watershed or valley * * * . It could be diverted to other watersheds.

Transferability of surface water for irrigation of sugar lands outside the watershed has been consistently recognized in Hawaii since at least 1867 when Chief Justice Allen gave judgment in *Peck v. Bailey, supra*, n. 7. Hobbs, Hawaii A Pageant of the Soil 72–73 (1935). McBryde's Trial Brief filed herein February 5, 1976, Appendix A, pp. 2–17.

14. Justice Marumoto's formulation from the record of the issues is as follows: (Pl.Ex. 7 at 96)

"The issues in this case, raised and tried in the circuit court, were: (1) the quantity of water of Koula Stream and Manuahi Stream to which McBryde is entitled as appurtenant to its lands in the Hanapepe valley; (2) the quantity of such water to which the State is entitled as appurtenant to its lands in the valley; (3) the quantity of such water to which other owners of lands in the valley are entitled as appurtenant to their lands; (4) the quantity of such water which McBryde is entitled to take under a claim of prescriptive right; and (5) the right of G&R, the State, McBryde, and other owners of lands in the valley to the storm and freshet water of Koula Stream and Manuahi Stream. Those also were the issues and the only issues presented and argued to this court on the present appeal."

process of law, and that the deprivation of property was effected without giving the parties the opportunity to present evidence and to be heard required by procedural due process.

9. On June 18, 1973, the Supreme Court entered an order directing McBryde, G&R, the State and the Small Owners to submit briefs limited to narrow issues related to (1) the construction of HRS § 7–1[15] and (2) the use of appurtenant water on lands other than to which the right is appurtenant (Pl.Ex. S.C.–66). The restriction of the issues precluded argument or hearing as to the basic question of the validity of the State appropriation of privately owned surface water.

10. Since no party appealed from the trial court's award to the Small Owners of appurtenant water rights of 50,050 gallons per acre per day, like Olokele, none of the Small Owners took an appeal from the trial judge's award.

11. At oral argument on September 18, 1973, the justices then stated that argument would be limited to the two issues specified (*supra*, Finding 9). (No record exists of the oral argument, the court having refused to have an official reporter present.) Plaintiffs were given no opportunity to argue against the *McBryde I* decision forbidding transfer of their waters out of the watershed, which deprived them of most of the value of their water rights. The majority opinion after rehearing was, as indicated *supra*, a curt *per curiam* that the court found "no reason to change the decision filed herein." The majority refused to hear or consider plaintiffs' constitutional claims.

12. No payment was or ever has been offered or made to any plaintiff by the State for the taking of their several vested properties in their appurtenant and prescriptive water rights.

13. In 1927, the Territory of Hawaii, the State's predecessor in interest, commenced an equity proceeding in the *First* Circuit Court (Oahu) against G&R, Hawaiian Sugar Company, Limited (Olokele's predecessor in interest), McBryde and 133 others alleging that the Territory had water rights to 220.72 acres of land in Hanapepe Valley and was entitled to approximately 50,000 gallons per acre per day of water. It also alleged that McBryde was the owner of 110.65 acres of land in Hanapepe Valley "entitled to water for irrigation purposes." It alleged that the 133 others had water rights for irrigation or for domestic purposes and asked that G&R be enjoined from diverting water which had the effect of depriving the lower owners of water rights to which they were entitled. Since it concerned water rights on Kauai, this case was dismissed under the doctrine of *forum non convenience* (see *Territory v. Gay*, 32 Haw. 404 (1932)). The filing of this complaint constituted a judicial admission by the Territory that the water rights of McBryde whether ancient, appurtenant or prescriptive were being properly used by McBryde for irrigation purposes.

14. In 1927 G&R in contemplation of a suit to determine water rights in Hanapepe Valley perpetuated testimony of *kamaaina* witnesses (Ex. G&R–G–3). In this perpetuation proceeding, the Territory and McBryde took the position that when *kamaainas* referred to land as "*kula*" (dry), the *kamaainas* meant that the lands were not in taro cultivation at the time they (the witnesses) first were familiar with the land, but could nevertheless be "wet" lands at the time of the mahele and thus entitled to water rights. The position of McBryde and the State was sustained by the *McBryde* trial court over the objection of G&R in adjudicating the water rights in Hanapepe. (Findings of Fact, Pl.Ex. 7, pp. 30–31)

---

**15.** The Supreme Court excluded argument on the validity of its revolutionary holding that the Land Commission Principles, *supra*, "specifically" and "emphatically" precluded the conveyance of any water in the mahele, and thence all surplus water has always been publicly owned (Opinion Pl.Ex. 7, pp. 185–87). This *ex cathedra* pronouncement was so obviously without rational basis as to have been characterized as "patently incorrect, if not absurd" by Justice Levinson (*id.* at 120, 123, 124; Pet. for Rehearing McBryde, Pl.Ex. S.C.–65 at 76–84). See Hutchins, *op. cit. supra* (Pl.Ex. 10) at 100–102, and McBryde's Brief. (Pl.Ex. S.C.–72 at 2–33)

[redacted] 

15. Since the amount of water per acre used in taro cultivation in 1848 was the basic measure for water rights under Hawaiian law, in 1930, the Territory joined with McBryde in a scientific experiment running over several years to simulate the ancient Hawaiian practice of taro cultivation at the time of the mahele, in order to determine the measure of water duty to be awarded periodically. The *McBryde* trial court made findings based on the results of this experiment.

16. Upon dismissal of the equity suit referred to in Paragraph 13 above, Equity No. 2911 (*Territory v. Gay*, Ex. M–J–6, p. 3) was filed in April 1928 citing only G&R and Hawaiian Sugar Co., Ltd. as being parties necessary to determine ownership of the normal surplus water. The purpose of the suit was "to establish a claim by the Territory to title in surplus waters arising on the lands" of G&R so as to utilize the same to continue the irrigation of *kula* land in the Ahupuaa of Hanapepe below the boundaries of the *ilis* of Manuahi and Kouls (Ex. M–J–6, p. 53). In these proceedings Territory of Hawaii alleged that the Ahupuaa of Hanapepe

> "is a portion of the public lands of the Territory of Hawaii, the fee simple title to which is in the United States of America and the Territory of Hawaii, under and by virtue of the provisions of the laws of the United States of America, is entitled to the use, possession and control thereof." (Ex. M–J–6, p. 6) [16]

By *Gay I* it was decided that "the Ili OF Koula though situate within the Ahupuaa of Hanapepe was never a part of the ahupuaa," 26 Haw. at 393, it was an *ili kupono.*

17. The trial court, in that suit, the Supreme Court on appeal, and the Ninth Circuit Court of Appeals on further appeal all recognized that *Gay II* concerned only "normal" and daily "surplus waters" and not prescriptive and appurtenant rights and made a final determination of the ownership of such "normal" surplus.

18. The judgment in *Gay II* determined that two of the partners of G&R as the adjudicated owners of the *ili kupono* on which the stream arose, and not the Territory, were the owners of the normal surplus waters flowing from their lands into the River and as such were free to transport normal surplus water to irrigated sugar lands on adjacent lands outside the valley.[17]

19. In 1941, G&R leased land at Makaweli to Olokele for the purpose of conducting a sugar plantation, with the requirement that G&R deliver a share of G&R's water from Hanapepe to Olokele at Makaweli, *i. e.,* out of the Hanapepe watershed. In the years 1945 through 1949, Olokele expended $788,839.35 on building the Hanonui Tunnel. (Answers to Requests Nos. 21, 22 and 23 of G&R for Admissions)

20. G&R and its lessees (Olokele and Hawaiian Sugar Co.) and McBryde have respectively spent sums accounted in the millions of dollars to develop sugar plantations at Hanapepe, Makaweli, Eleele, Wahiawa, Koloa, Lawai and Kalaheo, all on the Island of Kauai, which include areas where sugar cane cannot be grown without irrigation by water diverted from its natural watershed. (Testimony of Selwyn A. Robinson, Roland D. Gerner, Richard H. Cox and Ex. M–J–6, p. 53) The rainfall in the area of G&R's and Olokele's sugar cane fields is approximately 23 inches a year,

16. In *Gay II, supra* n. 7, the Ninth Circuit Court of Appeals paraphrased the Territory's petition as a claim to be the owner of so-called "surplus waters" under the Hawaiian law, by virtue of the rights of the King of Hawaii, ceded to the United States and by it conferred in trust upon the Territory.

17. Justice Marumoto's summary, *Territory v. Gay*, is as follows (Pl.Ex. 7, at 96):

"I do not think that there can be any question that *Gay II* established the following: (1) the ownership by G&R of the normal surplus water of Koula Stream and Manuahi Stream; and (2) the right of G&R to divert such surplus water to areas beyond the Hanapepe valley.

"*Gay II* is res judicata only as between the State and G&R. However, no party other than the Territory every challenged the ownership by G&R of the normal surplus water of the two streams. Nor has any party ever questioned the right of G&R to divert such water from the Hanapepe valley to areas outside of the valley."

inadequate to grow cane. Irrigation necessarily depends on bringing in water from the Manuahi and Koula streams on the east and the Makaweli river on the west. The Makaweli river, while it runs wholly within G&R's *ahupuaa* of Makaweli, is in a separate watershed. (Testimony of Selwyn Robinson, Ex. 0–15)

21. For a period in excess of seventy-five years, the several governments of Hawaii have executed the laws of the Kingdom, the Territory and the State of Hawaii in a manner which has been guided by court decisions on the question of surplus water, which expressly or implicitly acknowledged the title to surplus water rests in the owner of the *ahupuaa* or *ili kupono* in which it originates and that such water may be transported out of the watershed of origin. (Testimony of Richard H. Cox and Ex. M–Fed.–10) [18]

22. Since 1899, McBryde has been continuously engaged in the production of sugar cane and its irrigation water has been partly surface water and partly underground water. The transmittal of water from the River and the use of this water in part on the Eleele and Koloa Plantations and outside the Hanapepe watershed for irrigation has been continuous since the construction of the original pump on the River prior to the year 1900. (Stipulation, Ex. M–Fed.–1)

23. McBryde cultivated 5,955 acres on its sugar plantation which extends from Hanapepe to Waikomo (Koloa), a distance of 9 miles and, except for 300 acres, all is irrigated land. An average of 30 to 40 million gallons per day is utilized for irrigation, coming from four principal surface supplies providing over half the supply, and five pumping stations with underground supplies. McBryde produced 31,716 tons of sugar in 1972 with a gross income from sugar and molasses of $5,586,531.00. (Ex. M–Fed.–13, pp. 1, 2)

24. McBryde's surface and underground water supply from Hanapepe averages over 20 million gallons per day and is transported by three major ditches extending 5½ miles to the east of Hanapepe Valley; and that these Hanapepe supplies provide the primary irrigation supply for 3,200 acres of cane on the *ili* of Eleele and *ahupuaas* of Wahiawa, Kalaheo and Lawai. (Ex. M–Fed.–13, p. 2)

25. McBryde's surface supply from the Wahiawa, Lawai and Omao streams provides about 13,000,000 gallons per day of irrigation water for 1,790 acres of its other cane lands. (Ex. M–Fed.–13, p. 2)

26. In reliance on its water supply McBryde had expended, as of December 31, 1972, the sum of $11,863,392.43 in capital improvements for its irrigation system, mill machinery, equipment and other facilities still in service to operate the plantation as follows:

Irrigation System

| | |
|---|---|
| Water development | $ 340,131.00 |
| Reservoir | 752,646.02 |
| Pump station | 420,190.52 |
| Ditch system | 631,576.07 |
| Other irrigation facilities | 1,088,247.07 |
| Subtotal | 3,232,790.68 |
| Factory and other buildings | 996,559.65 |
| Machinery and equipment | 5,173,912.19 |
| Roads and bridges | 502,855.00 |
| Electric power system (developed primarily to provide power for the pumping of irrigation water) | 1,656,950.30 |
| Domestic water and sewer systems | 300,324.61 |
| Total | $11,863,392.43 |

Expenditures for capital improvements listed above do not include expenditures made for acquiring land or for improving the condition of the land for purposes of cultivation, nor does the compilation include the cost or value of growing crops. (Ex. M–Fed.–13, pp. 2, 3)

27. The parties herein have stipulated that plaintiff McBryde and Olokele have incurred

---

18. Ex. M–Fed.–10 is a long schedule of water rights purchased by McBryde from 1899 to 1962 through acquisitions of *konohiki* lands and *kuleanas* as well as separated water rights.

The schedule shows that lands were sometimes sold to the State or to private persons, reserving water rights.

"substantial expenditures subsequent to 1930 in the diversion of water from the watershed to the Hanapepe River and in the use of that water on their respective plantations. The amounts expended in the construction of the Hanonui Tunnel alone were in excess of $119,000 by the Robinsons and $788,880 by Olokele. McBryde's expenditures exceeded $558,-000 for pumping equipment and siphons and $60,000 for the construction of a reservoir to store water." (Ex. O-14) The figures referred to in this stipulation are included within the total expenditures of $11,863,392.43 shown in Paragraph 26 above.

28. By an "Agreement and Bill of Sale" made as of August 1, 1941, Olokele was assigned the lease of Hawaiian Sugar Company on its plantation near Hanapepe. (Testimony of Selwyn A. Robinson; Ex. O-1). Olokele leases from G&R the lands to which waters were being diverted from the River since the filing of *Territory v. Gay.* (Ex. O-2, O-3 and O-4). When G&R leased property to Olokele (and Hawaiian Sugar), the leased properties were being used for sugar cultivation with waters transported from the watershed of the River. (Testimony of Selwyn A. Robinson and Roland D. Gerner)

29. The plantations of G&R, Olokele and McBryde could not be operated at anywhere near their present size without water from the watershed of the River. (Testimony of Selwyn A. Robinson, Roland D. Gerner, and Richard A. Cox)

30. The Robinson lease to Olokele, dated July 15, 1944 (Ex. M-I-27) restricted Olokele to the growing of sugar cane (p. 67). The rent was based on a formula which may be called 5% of Olokele's gross proceeds from "all sugar cane and molasses and by-products" (pp. 19-21) or 25% of its net profits (pp. 21-23). The lessors agreed to maintain and operate the Olokele ditch and the Koula ditch and to deliver 57% (p. 28) of the water from those two ditches which are connected. (See Ex. O-15). The lessors agreed to deliver their harvested cane to lessee's mill, and lessee to make it into raw sugar (pp. 38-48).

31. G&R employs 174 employees on its sugar plantation and 11 on its ranching operation. In 1973 its pension obligations to its employees demanded a lump sum capital fund in excess of $1,555,000. (In 1975 G&R paid Prudential Insurance Company of America $1,241,026.53 to fund its pension obligations.)

32. Without irrigation water, the only use for most of G&R's sugar lands would be as part-time pasture, because the intermittent flowing streams would provide drinking water for the cattle only during the rainy months. Therefore, only the areas near enough to the Makaweli River could be used as pasture during most of the year.

The sugar lands, if unirrigated, would be appraised as "very poor pasture," at an assessed value of $8 an acre, or $4 if dedicated to agricultural use. In contrast, "cane" lands are assessed at $666 an acre (or $333 if dedicated), indicating $951.42 an acre as a sound value.

33. Before *McBryde I*, the Small Owners could sell their water rights (usually to one of the three plaintiff plantations) at a "rule of thumb price" of one acre of water rights for one acre of dry land. Some had sold, and thus severed, appurtenant water rights. *McBryde I* rendered these severed rights useless and of no value.

### State Action

34. For many years, some of the Small Owners used portions of the waters owned by them on lands to which the waters used were not originally appurtenant. (Ex. A-3, Testimony of Hideo Nonaka

### Governmental Recognition of Private Ownership of Water and of the Transportability of Water

35. The defendant State Officials and their predecessors, the State and its predecessor, the Territory of Hawaii, have for at least a century, repeatedly entered into a variety of transactions recognizing private ownership of normal surplus water and the right of persons with rights to appurtenant,

prescriptive, and surplus waters to divert those waters for use beyond the watershed of origin. By way of illustration, these transactions include the following:

(a) the taxation of water as private property and the valuation of land for tax purposes with consideration of the enhancement in value resulting from the land's access to water diverted from beyond the watershed of origin; [19]

(b) the acceptance by the State of forest reserve surrenders under which water rights were reserved to the transferor; [20]

(c) transactions (including the lease by the State to Olokele of a portion of Olokele's Hanapepe Plantation) in which property is leased to private parties with the government reserving the right to transfer the water rights of the leased property to others; [21]

(d) the condemnation of property with water rights reserved to the condemnee; [22]

(e) transactions in which the transportability of water beyond the watershed of origin is specifically recognized; [23]

(f) transactions in which water rights were sold by the Territory for use outside of the watershed of origin.[24]

36. The existing State tax statute (HRS § 246–10(f)) lists "water privileges, availability of water and its costs" as a factor to be considered in fixing the valuation of the land. (Ex. M–Fed.–1, Attachment Para. No. 7). Plantations owning private surface waters have been and are being assessed a tax on the higher value of their land by reason of the availability of the water outside the watersheds of origin. The application of the State formula developed by the tax administrators for the valuation of irrigated sugar lands is based on the State's assumption that surface waters can be privately owned and transported for irrigation as determined by the consistent Hawaiian decisions. (M–Fed.–1, Attachment Para. No. 7 and testimony of Richard H. Cox)

37. The taxability as well as severability of privately owned surface water from the land to which it was originally appurtenant was expressly confirmed by the 1913 decision of the Supreme Court in *In Re Taxes, Waiahole Water Co.*, 21 Haw. 679 (1913). The Tax Appeal Court of the State of Hawaii decided that a prior Supreme Court decision that water rights "severed in ownership from the lands can no longer be regarded for purposes of taxation as appurtenant to the lands to which they were originally appurtenant" had not been superseded by the 1932 tax law revision (L.1932 2d, c. 40, § 26; HRS § 246–10); *Re Tax Appeal of L. L. McCandless Trust Estate* (No. 685 in the Tax Appeal Court of the State of Hawaii (1963), unreported, Ex. M–Fed.–1, Attachment Para. No. 10).

38. A basic agreement acknowledging private ownership and right of transportation of major sources of water for the Island of Maui was executed March 18, 1938 ("the 1938 agreement") (see Stipulation, Ex. M–Fed.–1, Para. No. 22 and attachment thereto). The 1938 agreement provided a perpetual arrangement under which water owned by the private owners as well as water leased from public sources originating in the east part of the Island of Maui could be transported for use in the arid plains in the central area of Maui. This was accomplished by the granting by the Territory to East Maui Irrigation of perpetual easements covering its aqueduct and by effecting a permanent agreement as to how the portions of the flow in the aqueduct "which shall be considered the company

---

**19.** Ex. M–Fed.–1, attachments to paragraphs 4, 5, 6, 7, 8 and 10; *In Re Taxes, Waiahole Water Company, supra* n. 7; Testimony of Richard A. Cox.

**20.** Exs. 0–13 and M–Fed.–1, paragraph 13 and attachments to paragraphs 11, 12, 13, 14 and 15.

**21.** State Officials' Ex. 12; Ex. 0–11.

**22.** Ex. 0–12.

**23.** Ex. M–Fed.–18, Appendix p. 6; Ex. M–Fed.–1, attachment to paragraph 22; Ex. M–Fed.–17, Appendix 1, p. 6; Testimony of Richard A. Cox re Waiahole Water System.

**24.** Ex. M–Fed.–7.

water" and the portion that is considered "public water" shall bear the expense of upkeep and operation of the aqueduct. All licenses to use public water originating in East Maui that have been issued by the Territory and the State since 1938 have been under that agreement. (Stipulation, Ex. M–Fed.–1)

39. The State in 1970 granted a license to Waiahole Irrigation Company, Limited for a period to December 31, 2000. This license is for public water to be conveyed through the Waiahole Tunnel to the leeward side of the Island of Oahu and the license refers specifically to the fact that water conveyed by the aqueduct includes "water obtained from sources owned privately" by Waiahole Irrigation Company. (Ex. M–Fed.–1, Para. No. 28 and attachment thereto)

*Purchase, Sale and Lease of Rights to Surface Water by the Government and by Private Persons*

40. Since the earliest recognition of private property in Hawaii, rights to surface waters have been bought, sold, leased and otherwise dealt with as other private property. The government has bought and paid for privately owned surface water and all branches of the Hawaiian government have consistently dealt with surface water however owned or acquired by the government in all respects and in the same manner as private persons. (Pl.Ex. 10, p. 4; [25] all exhibits attached to Stipulation, Ex. M–Fed.–1).

41. Major ditch systems have been developed by private owners for transporting water for irrigation on each of the major islands of Hawaii. (These are described generally in the 1917 Federal Government Report, Ex. M–Fed.–2, pp. 74–79, and are brought up to date with some details as to the amounts of surface water delivered in Exs. M–Fed.–14 and M–Fed.–17.) The construction and development of these systems was encouraged by (1) the body of Hawaiian law establishing the private ownership of surface water and the transportability of all water, however owned, for irrigation,[26] and (2) by statutes authorizing the acquisition of rights of way over both public and private lands for the construction of aqueducts which have been in effect since 1872.

42. The East Kauai Water Company, formed in 1920, has constructed ditches, tunnels and other aqueduct facilities at a cost of up to $1,000,000 for the transport of government water used for irrigation and domestic use.

---

25. Hutchins, *op. cit. supra,* examined all of the legal material extending up to the year 1946 and concluded: "In Hawaii the right to unused water inheres in the ownership of the original units of land—ahupuaa and ilis—not in the public; the government holds water rights incident to its lands, *just as does an individual.*" (Pl.Ex. 10 at 47); Ex. M–Fed.–7 (1906 Opinion of Atty. General that *Peck v. Bailey, supra,* also applies to sale of government water to be transported for use); Ex. M–Fed.–8 (Opinion of Atty. General 1919 construing 1904 agreement for purchase of surface water by the Territory from Pioneer Mill Co.)

26. Hutchins, *op. cit. supra,* (Pl.Ex. 10) summarizes at pp. 17–20 the importance of irrigation to the agriculture of Hawaii and refers to the fact that (p. 17 fn. 42) "the irrigated plantation, having expended large sums per cultivated acre in water development and irrigation facilities, must operate its cane land under administration in order to obtain the yield and realize the operating economies which are necessary to justify the costs * * *." He also points out that about half of the land that produces sugar cane is under irrigation and that tonnage produced on irrigated plantations represents two-thirds or more of the total sugar crop; that 4,000 tons of water are required on an average to mature the cane for a ton of sugar; that the aggregate investment (undepreciated) in major irrigation works for the service of sugar cane lands exceeded $39,000,000 in 1934—an average of $304.00 per acre. He also points out that the aggregate of proven uses of water extant at the time of the mahele, even if all such uses were converted from taro to sugar irrigation, would have been adequate for only a small fraction of the present acreage in cane irrigated from surface streams. "More water than that covered by ancient, appurtenant rights was required; hence there came to be developed principles related to the use of 'surplus water'—meaning the quantity flowing in the stream in excess of that required to satisfy the ancient appurtenant and prescriptive rights attaching to the waters of that stream. (*Id.* at 58)

43. Pioneer Mill Company of the Island of Maui had, in 1917, irrigation equipment including 6½ miles of tunnel for bringing 50,000,000 gallons of water from the mountains. The Territory in the years of 1911, 1915, 1917, 1927, 1940 and 1964 leased and deeded to Pioneer Mill Company reservoir rights, rights of way for irrigation ditches, and granted other rights so as to make possible the operation of this extensive irrigation system carrying both publicly and privately owned waters over government lands. (Ex. M–Fed.–2, p. 77; Ex. M–Fed.–18, Appendix 2, p. 9)

44. On the Island of Hawaii, the Hawaiian Irrigation Company leases surface water from the Bishop Museum which it transports over the lower Hamakua Ditch. The construction of this system of tunnels, ditches and flumes to bring water out of Waipio Valley began in 1904 and was completed in 1911 "at a multimillion dollar expense." It transports 26 million gallons of water per day out of the Waipio Valley for a distance of approximately 12 miles through and across more than 50 *ahupuaas* along the coast of the Island of Hawaii.[27] (Ex. M–Fed.–17, p. 4)

45. In 1964 the State leased to Olokele State land in Hanapepe for the purpose of maintaining sugar plantations thereon. (Ex. S.O.–12) Paragraph 8 of the lease reserves all waters, including surface water, to the State, and Paragraph 26 requires that the land shall be used for "intensive agricultural uses." The water brought by Olokele through the Olokele and Koula ditches carrying the private waters owned by G&R and leased to Olokele constitute the *sole* water used in maintaining this irrigated plantation. If this water were not available to Olokele Sugar Company for use in carrying out its contractual obligation to the State, there "could be no Olokele Sugar Company." (Testimony of Roland D. Gerner)

46. On December 23, 1970, the State purchased surface water rights owned by Waiahole Irrigation Company and the deed recites the manner in which such rights were acquired by Waiahole Water Company in 1912 (Ex. M–Fed.–1, Attachment to Para. No. 26). The deed, approved by the Deputy Attorney General for the State, confirms State recognition (1) that surface water was "originally owned and held by" various private owners and (2) that these rights could be separated from the lands to which they were appurtenant. (Ex. M–Fed.–1, Attachments to Para. No. 26 and Para. Nos. 8 and 9)[28]

47. Both the State and the City and County of Honolulu have repeatedly acquired privately owned surface water rights by suits in condemnation for which payments were made pursuant to statutory requirements. (For example, suits were filed in 1940, 1945, 1946, 1954 and 1966 referred to in Ex. M–Fed.–18, Appendix pp. 12–13)

48. On July 27, 1962 McBryde sold land to the State consisting of portions of three *kuleanas* in Hanapepe, and McBryde reserved to itself all water rights. (Items 26, 27 and 28 in Ex. M–Fed.–1) Other sales of McBryde land to the State with reservation of surface water rights to itself (Items 26,

27. The history of the ditch is summarized in *Lalakea v. Haw'n Irrig. Co.*, 36 Haw. 692 (1944) which decided that where the ditch company has not exercised the power of eminent domain, it could acquire title to a right of way by adverse possession.

28. Hutchins discusses the Supreme Court's specific adjudication as to the private ownership of this water as follows: (Plaintiffs' Ex. 10 at 73): "The control of the konohiki over surplus waters was again emphasized in a decision on questions of cotenancy submitted to the supreme court upon an agreed statement of facts. The court stated: [*Foster v. Waiahole Water Co.*, 25 Haw. 726, 734 (1921)]

The water demised by the Kahana lease is properly termed ahupuaa, konohiki or surplus water and was never appurtenant to any particular part of the land and is thus distinguished from prescriptive or riparian water rights. It is this class of water which originally the chief or konohiki could dispose of at will irrespective of the rights of the other owners and tenants upon or within the ahupuaa in the prescriptive or riparian waters. *Haw'n Com. & Sug. Co.*, 15 Haw. 675." Other examples of purchases by the government of private surface water in 1904, 1906 and 1939 are described in M–Fed.–18, Appendix, p. 11.

32 and 39 in Ex. M–Fed.–1) were made of portions of Koloa *kuleanas* purchased by McBryde for its water rights.

49. The State permitted the owners to reserve their privately owned water rights "vested" in the final order of condemnation in Civil No. 1195, in the Circuit Court of the Second Circuit, being for the purpose of condemning land for the Kahekili Highway, Waihee Bridges and Approaches. The order entered May 19, 1972 excepts from the condemnation

"those certain water rights vested in Alexander & Baldwin, Inc. . . . and Wailuku Sugar Company . . . by way of Exchange Deed dated June 23, 1924 and recorded in the Bureau of Conveyances in Liber 740, Pages 164–181, and saving and excepting any other water rights of Wailuku Sugar Company in the property sought to be condemned herein, provided however that in developing and maintaining such excepted water rights, neither Wailuku Sugar Company nor its successors or assignees shall disturb the highway to be constructed over said condemned property." (See Ex. M–Fed.–1, Para. No. 27 and attachment)

50. Immediately before statehood, the Hawaii Water Authority (created under the provisions of Act 22, S.L.1957) submitted to the legislature its report on the state of Hawaiian water law. Part 3 (Water Rights) states:

"*Water Rights and Water Development.* Surface-water rights in Hawaii are considered property rights and can be sold or acquired separately from the land to which they are appurtenant. The legal right in Hawaii to transport surface water from one watershed to another, not permitted under riparian water law, has made it possible to provide irrigation to Hawaii's water-deficient and generally better arable lands and develop a sound

agricultural economy. Extensive developments of surface water have been accomplished under Hawaii's existing surface-water rights law. It can be concluded that the many court decisions have firmly established the principles of surface-water rights in Hawaii. It does not seem likely that any legislation enacted to materially alter existing surface-water rights law would be held constitutional by Hawaii's courts nor does there appear any need at this time for legislation to strengthen or change this system of surface water law." *Water Resources in Hawaii*, Hawaii Water Authority, Mar. 1959, pp. 64–65.[29]

51. The long recognition of separability of water rights is summarized in Hutchins, The Hawaiian System of Water Rights, p. 121, as follows:

"The water right, while appurtenant to land for the benefit of which the easement exists, is not an inseparable appurtenance. That is to say, it may be severed in ownership from the lands by a separate sale of the water right, after which it cannot be regarded, for purposes of taxation, as appurtenant to such lands; or it may be separately leased; or it may be separated from the lands by prescription."[30]

52. In 1910 the Congress amended Section 55 of the Hawaiian Organic Act to empower the Territorial Legislature to:

"by general act provide for the condemnation of property for public uses, including the condemnation of rights-of-way for the *transmission of water for irrigation* and other purposes." Act of May 27, 1910, 36 Stat. 443, 48 U.S.C. § 562 (emphasis added).

Pursuant to Congressional authority, the Territorial Legislature in 1911 provided:

---

**29.** The Board of Land and Natural Resources charged with the duty of formulating a master plan for the development, conservation and most beneficial use of water resources is given condemnation power to acquire water and water sources and transmission facilities. HRS § 174–1 to 22.

**30.** To the same effect is the Report of the Water Commission of the Territory of Hawaii, Honolulu, 1917, pp. 19–20.

"Corporations organized to develop, store, convey, distribute and transmit water for irrigation, . . . shall have the right to exercise the power of eminent domain as hereinafter provided.

. . .

"Such corporations shall have the right to condemn rights-of-way over lands and property for ditches, tunnels, flumes and pipe-lines necessary or proper for the construction and maintenance of a system for conveying, distributing, and transmitting water for irrigation, fluming, mill use . . . ." Act 124 S.L. 1911 (now § 101-41, 101-42 HRS).

53. At least since 1880 taxing statutes of the Kingdom and succeeding governments have recognized that surface water severed from its land of origin is taxable as property, per se (L.1896, c. 51, § 17; L.1932, 2d, c. 40), and water rights are assessable separately for tax purposes. (*Waiahole* taxes) 21 Haw. 679 (1913), *supra*; (*McCandless* taxes) No. 685, Tax Appeal Court of the State of Hawaii (1963), *supra*; RLH § 246-10(f).

## CONCLUSIONS OF LAW

Plaintiffs have claimed several grounds as entitling them to the relief sought. G&R maintain that federal common law must apply to their claim as against the State authorities because of the federally affirmed decision in *Gay II*. All plaintiffs claim that their rights are protected under 43 U.S.C. § 661.

The two basic grounds of relief urged by the plaintiffs are that they were deprived of their property and their water rights—property rights of great financial value—without either procedural or substantive due process, in violation of the Fourteenth Amendment.

Unquestionably, if the state legislature had enacted a law attempting to accomplish what the Supreme Court did in *McBryde I* the transgression of the due process clause of the Fourteenth Amendment would be obvious. "The violation is none the less clear when that result is accomplished by the state judiciary in the course of [interpreting state law]. The federal guaranty of due process extends to state action through its judicial as well as through its legislative, executive, or administrative branch of government." *Brinkerhoff-Farris Co. v. Hill*, 281 U.S. 673, 680, 50 S.Ct. 451, 454, 74 L.Ed. 1107 (1930).

At the inception therefore, a determination must be made as to whether plaintiffs' rights were destroyed without due process having been afforded them by the court.

### Procedural Due Process

■ As appears above and as decried by Justice Marumoto in dissent in *McBryde I*, the effect of the judgment of the Supreme Court was to deprive the plaintiffs of their property, water and water rights, without affording any of them an opportunity to be heard in their defense. The state court violated not only its own rules, but the state law as well, by deciding the case on issues that were never raised or argued.

Thereafter on the almost farcical "rehearing", although the due process issues were urged by the plaintiffs, the court refused to permit argument thereon or consider the same. Rather, the court extended a clearly pro forma invitation to the plaintiffs to "prove to us why we were wrong" on issues and conclusions assumed sua sponte and decided sua sponte by the court.

On this basis alone the judgment of the court would have to be declared void, for if permitted to remain in full force and effect, plaintiffs have been deprived of property rights without ever having had a fair and meaningful opportunity to defend against their being handed over to the State on a silver platter without even a request by the State for the gift.

A ruling on this ground only, however, would not go to the merits of plaintiffs' claims.

### Federal Common Law

G&R has argued that the federal common law must be applied to their own claim of water rights, since those rights were determined by a federal court in *Gay II*. This

position evidences an attempt to extend *Hughes v. Washington,* 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967), and *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), to G&R's federally affirmed rights. Any such extension has been curtailed by *Oregon v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), which specifically overruled *Bonelli* and, according to Justice Marshall in dissent, foretold the overruling of *Hughes.*

■ The factual problems of land boundaries along navigable waters, upon which the above cases were so narrowly focused, is not here in question. The title of plaintiffs to their respective riparian lands and water rights perforce came to them through the Kingdom, via the mahele. No rights were acquired from the United States following annexation. As pointed out in *Oregon v. Corvallis Sand & Gravel, supra,* once the title to land shall have passed into private hands and become vested under United States law, then, upon statehood, that property, like all other property in the state, is subject to state legislation. To hold otherwise would negate the equal footing doctrine.

### *Federal Rights Under 43 U.S.C. § 661*

■ Plaintiffs have urged that 43 U.S.C. § 661[31] gives federal protection to them as possessors and owners of vested water rights under recognized customs, laws and decisions of the courts of Hawaii. Section 661 applies only to "public lands" of the United States. Upon annexation all government lands of the Republic, including the "crown lands", became the property of the United States and thus "public lands." See *U. S. v. Fullard-Leo,* 331 U.S. 256, 269, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947). Those "public lands" of the United States, however, were never subject to sale or disposal under general federal law. By §§ 73, 91 and 99 of the Organic Act,[32] all those lands (with certain named exceptions) were entrusted to and became "public lands" of the Territory of Hawaii and "the laws of Hawaii relating to public lands * * * shall continue in force." (§ 73(c)) Thus § 661 had never any application to the "public lands" of Hawaii, nor to plaintiffs' water rights.

### *Vested Rights*

By the Organic Act, §§ 1, 5, 6, 7 and 10, the laws of Hawaii, as they existed under the Republic of Hawaii were continued on in full force and effect, unless inconsistent with the Constitution and laws of the United States, or the provisions of the Act. By the Admission Act,[33] the State succeeded to the title which the Territory had to its public lands (§ 5) and all Territorial laws were continued in force (§ 15). After the mahele, the lands involved here were and are private, and until *McBryde I,* rights to surface waters, unquestionably, went with the land. Neither under Annexation nor Statehood were any rights of private property curtailed, let alone summarily taken away, by or for either the United States, the Territory or the State. Only the Supreme Court of Hawaii, by *McBryde I* and *McBryde II,* undertook to do that—and without compensating the owners thereof.

■ As is manifest from the above, from the very beginning of Hawaiian law on waters, and for over 100 years thereafter, water rights were severable from the land to which such rights were appurtenant and surface water was held to be freely transportable out of its watershed. The rights of owners along a stream were far more than mere riparian rights under the English common law. "Their right is to divert and

---

**31.** § 661. Appropriation of waters on public lands; rights-of-way for canals and ditches

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; * * *."

Small Owners Trial Brief, Appendix 13.

**32.** Act of April 30, 1900, c. 339, 31 Stat. 141.

**33.** Act of March 18, 1959, P.L. 86–3, 73 Stat. 4.

consume—not merely to use and return." *Carter v. Territory*, 24 Haw. 47, 61 (1917).

Congress as well as the Territory and State, by giving the power of condemnation of rights-of-way to private corporations for ditches, flumes, etc., for irrigation, fluming and mill uses, encouraged and facilitated the diversion and transporting of water out of its watershed.

From the days of the Kingdom until even now, the governments of Hawaii have taxed severed water rights, as such, or have provided that water privileges, availability of water, and its costs are factors to be considered in fixing land values. Lands with severed water rights, even after *McBryde II*, are taxed for land value only, *i. e.*, as if without water.

The several governments of Hawaii have purchased surface water from private owners, have condemned private water rights, have sold and exchanged lands, with water rights reserved to private owners and have granted easements for ditches and pipelines to transport water across government lands.

By the terms of sugar cane leases of government land, as well as in other leases, such as to some of the Small Owners, in order to carry out the provisions of the lease regarding the crops to be grown, the private lessees are forced to transport privately owned surface water on to the government land. The leases were entered into upon reliance by the State as well as the lessees of the well established law of water as it was known and accepted by all, including the State, before *McBryde I*.

As indicated, there has been a continuous government policy to encourage the transport of water for private economic use.

On Kauai, Oahu and Maui, the great majority of the sugar cane lands are irrigated

lands, and on the island of Hawaii three (formerly four) plantations are irrigated. The "irrigated" sugar plantations have millions of dollars invested in tunnels, dams, ditches and pipe, for transporting water out of its watershed.

Under the "new law" of *McBryde I*, Olokele and McBryde, *certainly*, and other plantations also, would be put out of business and G&R's lands would be reduced from high value cane lands to low value pasture lands, *i. e.*, worth only one-third to one-tenth of cane land. The employment of many hundreds of workers on sugar plantations would be jeopardized.[34]

Without delving into all of the legal ramifications of *Gay II*, it can be said with certainty that thereby:

(1) G&R were declared to be the owners of the *ilis kupono* of Koula and Manuahi.

(2) The common law doctrine of riparian rights (as now decreed by *McBryde I*) "save only as to one feature of the *Carter* case, that relating to freshet waters, it is not and never has been the law in Hawaii." *Gay II*, 31 Haw. at 396.

(3) There is normally a surplus of water flowing in the River over and above the quantity required to satisfy the prescriptive and appurtenant needs and rights of certain lower *kuleanas* and other lands of the *ahupuaa* of Hanapepe.

(4) Originally the King was the sole owner of waters and the lands and he "could do with either or both as he pleased. * * * [N]o limitation * * * ever existed or was supposed to exist to his power to use the surplus waters as he saw fit." And citing *Peck v. Bailey, supra*, 8 Haw. 658: "If any of the lands [conveyed by the King or awarded by the Land Commission] were entitled to water by immemorial usage, this

---

**34.** Although not mentioned by the State attorney general in the State's trial brief, the vesting by *McBryde I* of all surface water rights in the State, subject only to the appurtenant common law riparian rights of those lands along a stream, would not automatically give to the State the right to sell any such waters for transport outside a watershed. *McBryde I* gave to each owner of riparian lands "the right

to the natural flow of the stream without substantial diminution and in shape and size given it by nature." *McBryde I*, 54 Haw. at 198, 504 P.2d at 1344. Another of the hydra-headed problems created by *McBryde I* would be the impact of NEPA upon any attempted diversion of surface waters by the State after riparian rights are taken care of, or even when the State owns all the lands along a stream.

right was included in the conveyance as an appurtenance." *Gay II*, 31 Haw. at 385–86. "The water appurtenant to each land belonged to the owner of the land and was severable therefrom and was transferable either with or without grant to other lands irrespective of whether such other lands were riparian or nonriparian (provided only that no injury was by the diversion made to the rights to other lands)." *Id.* 31 Haw. at 400.

(5) G&R as the owners of the *ilis kupono* were the owners of the streams originating on the above *ilis* and are therefore entitled to use and divert such waters thereof as they see fit, after leaving in the streams "the quantity required to satisfy the needs of certain lower kuleanas and other lands in the ahupuaa of Hanapepe which have become entitled to water by prescription or to which water rights were appurtenant at the time when land commission awards thereof were made." *Id.* 31 Haw. at 382. These lands would be the lands of the State, McBryde and Small Owners. As owners of the *ilis kupono*, G&R were owners of the normal surplus waters of the two streams and could divert and transfer the normal surplus as G&R pleased.

(6) G&R's water rights have financial value. *Id.* 31 Haw. at 401.

### Substantive Due Process

As preceding analysis makes manifest, Hawaii's water rights law was, generally, well settled and stable prior to *McBryde I*. The right to appurtenant waters was conveyed with the lands awarded under the mahele. The awardees of the *ahupuaas* and *ilis kupono* were given the same rights of control of the waters arising thereon as had the King. The right to take and divert surface water out of the watershed was unquestioned, even by the State. Water rights were severable from the land, at a price. The English common law doctrine of riparian rights was *not* the law in Hawaii. Hawaii Supreme Court decision after decision had established the above rules of law.

*McBryde I* therefore came as a shocking, violent deviation from the solidly estab-lished case law—totally unexpected and impossible to have been anticipated. It was a radical departure from prior decisions.

Based upon well settled law, the State, the plaintiffs, and many others in the same class as the plaintiffs had spent millions of dollars in dams, ditches, pump equipment, plantations, mills and farms, to utilize the surface waters of Hawaii. Some of the plaintiffs had entered into contracts, some into contracts with the State, which compelled them to use diverted water to fulfill those contracts.

It had been decided in *Gay II* that G&R had certain rights to surplus water, superior to the State, a decision to which the State's predecessor in title, the Territory of Hawaii, was a party. Yet by *McBryde I*, that decision was reduced to an empty husk—the court grudgingly giving lip service to the doctrine of res judicata, *McBryde I*, 54 Haw. at 179, 504 P.2d 1330, and then rendering it meaningless by saying in effect: You won the judgment in *Gay II* but

"by the Mahele and subsequent Land Commission Award and issuance of Royal Patent right to water was not intended to be, could not be, and was not transferred to the awardee, and the ownership of water in natural watercourses, streams and rivers remained in the people of Hawaii for their common good. Therefore, we hold that as between the State and McBryde, and between McBryde and Gay & Robinson, the State is the owner of the water in the Koula Stream and Hanapepe River." *Id.* at 186, 504 P.2d at 1339.

Thus, no longer are there any "surplus waters"! The only water rights remaining to G&R out of *Gay II* are those appurtenant to the land, based on the taro grown thereon at the time of the mahele, and G&R cannot divert even that out of the watershed! So spake the court.

The doctrine of res judicata may not so blithely be emasculated—and absolutely not upon the precedential authority of the four cases cited by the majority in *McBryde I* at 178, 504 P.2d 1330; *Greenfield v. Mather*, 32 Cal.2d 23, 194 P.2d 1 (1948); *Univer-*

sal Const. Co. v. City of Fort Lauderdale, 68 So.2d 366 (Fla.1953); People v. Somerville, 42 Ill.2d 1, 245 N.E.2d 461 (1969); Motor Vehicle Accident Indemnification Corp. v. National Grange Mutual Ins. Co., 19 N.Y.2d 115, 278 N.Y.S.2d 367, 224 N.E.2d 869 (1967). Each and every one were "special situation" cases in which each court considered deviation from applying the doctrine of res judicata on the catchall grounds of "avoiding manifest injustice" or "fundamental fairness." The facts in each and all of the four are not even remotely similar to those in Gay II.[35] In Gay II the Territory, the State's predecessor in title, sought an injunction to restrain G&R from diverting surplus waters of the River from the valley of Koula to the arid lands of Makaweli. The underlying problem was who owned the surplus water. The trial judge, a majority of the Territorial Supreme Court and the Court of Appeals of the Ninth Circuit all said G&R had title to and owned the surplus waters it was diverting. The injunction was denied. It was decreed that G&R owned and had a right to divert those waters.

■ That judgment between the same parties deciding the ownership and right to divert the surplus waters of the River binds even the Supreme Court of Hawaii. The pronunciamento of the Supreme Court in McBryde I cannot foreclose G&R from taking and diverting those litigated waters— even if pursuant to McBryde I the State did

have title to all the waters of the River! The valid and final judgment in Gay II operates as an absolute bar to any claim on the part of the State to the title to or right of diversion of the waters in question, regardless of whether or not the court in McBryde I was correct in holding that the State always has and now does own those waters. Filice v. U. S., 271 F.2d 782 (9th Cir. 1959), cert. denied, 362 U.S. 924, 80 S.Ct. 677, 4 L.Ed.2d 742 (1960); Lawlor v. National Screen Service, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

Apart from the above, the underlying question to be determined is whether each and every plaintiff has had property taken by the State, via judicial decision, and the State has so "taken" it without paying the plaintiffs for that property.

■ It is axiomatic that the law of real property is left to the states to develop and administer. Hawaii, like every other state, may by its legislature or its courts make changes in its real property laws, including laws governing property rights of riparian land owners in and to the use of waters flowing along their lands.[36] Underlying the right of the courts and legislature to make changes in the law, however, is the concomitant obligation of the State to compensate those whose property may have been taken over by the State by those changes. Chicago, Burlington &c. R'D v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). Even

---

**35.** Cf. Lester v. National Broadcasting Company, 217 F.2d 399 (9th Cir. 1955); Parker v. Westover, 221 F.2d 603 (9th Cir. 1955); Flynn v. State Board of Chiropractic Examiners, 418 F.2d 668 (9th Cir. 1969).

The State has called this court's attention to Scoggin v. Schrunk, 522 F.2d 436, 437 (1975), wherein the Court of Appeals of the Ninth Circuit stated:

"It is now established that where the federal constitutional claim is based on the same asserted wrong as was the subject of a state action, and where the parties are the same, res judicata will bar the federal constitutional claim whether it was asserted in state court or not, for the reason that the state judgment on the merits serves not only to bar every claim that was raised in state court but also to preclude the assertion of every legal theory or ground for recovery that might have

been raised in support of the granting of the desired relief."

That rule is founded on the assumption that plaintiffs' state and federal actions are based on the same claimed wrong. Flynn, supra. As fully set out heretofore, plaintiffs claimed wrong in this federal action was not within any of the issues raised and tried by the Fifth Circuit. No party including the State could have anticipated what the Supreme Court did, sua sponte. See n. 14, supra. The Supreme Court refused to allow plaintiffs to argue the constitutional issues raised by this federal action. The Scoggin case is inapposite.

**36.** Cf. In Re Application of Sanborn, 57 Haw. ——, 562 P.2d 771 (1977); In Re Application of Ashford, 50 Haw. 314, 440 P.2d 76 (1968); Baumann v. Smrha, 145 F.Supp. 617 (D.Kan.1956), aff'd, 352 U.S. 863, 77 S.Ct. 96, 1 L.Ed.2d 73 (1956).

by legislative fiat, property cannot be expropriated and taken over by the State without compensating the private owner for his lost rights. No more can private property be so taken away by judicial decision and handed over, gratis, to the State. "The touchstone of due process is the protection of the individual against arbitrary action of the government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935. As pointed out by Justice Stewart in *Hughes, supra,* 389 U.S. at 297, 88 S.Ct. 438, if it is determined that the plaintiffs here and not the State owned certain water rights prior to *McBryde I,* then unless the decision in *McBryde I* could have reasonably been expected, that decision cannot be accepted as a conclusive statement of the applicable law.

■ As indicated above, the decision made an unsolicited and unexpected gift to the State of all of the waters in all of the streams and to the complete surprise of all parties, said that the State had *always* owned the waters. There was no precedent for this determination. The court had to toss aside as dicta all of the mass of prior decisions to the contrary, turn its then blind eyes toward the rule of stare decisis, tear apart the doctrine of res judicata, and discover completely new meanings in ambiguous Hawaiian words and phrases used a century before in order to change the law of water rights and gift wrap the waters for the State.

"[A] State cannot be permitted to defeat the constitutional prohibition against taking property without due process of law by the simple device of asserting retroactively that the property it has taken never existed at all." *Hughes* 389 U.S. at 296–97, 88 S.Ct. at 442.

*McBryde I* did just that; its construction and interpretation of the meaning of the phrase "To encourage and even to enforce the usufruct of lands for the common good" in the 1846 Principles to mean that the King thereby retained title to all waters then used for agricultural or domestic purposes, and its cavalier assertion that because the missionaries came from Massachusetts, § 7 of the Laws of 1850 codified the English common law doctrine of riparian rights, most certainly effected an unforeseeable change in Hawaii's water rights laws as theretofore expounded in over 100 years of prior Hawaii Supreme Court opinions.

By *McBryde I* every person who had been led to believe they had clearly defined and well established water rights and uses of surface waters found that those water rights were declared by the court to belong to the State as part of the public domain, and that the use of any waters which might be appurtenant to any of their riparian lands was limited to and on that property only.

It may be that the court did not conceive its action as a taking—it said the plaintiffs never *had had* any such water rights, ergo, no taking! Just that simple!

■ The Constitution does not measure the taking of property by what a court may say or even what it may intend; the measure is by the result. For over a century neither the State nor its predecessors in title ever attempted to take water rights without either purchase or condemnation, but *McBryde I* took the plaintiffs' water rights for the State

"by effecting a retroactive transformation of private into public property—without paying for the privilege of doing so. * * * [T]he Due Process Clause of the Fourteenth Amendment forbids such confiscation by a State, no less through its courts than through its legislature, and no less when a taking is unintended than when it is deliberate. * * *"

*Hughes,* 389 U.S. at 298, 88 S.Ct. at 443.

This retroactive taking of private property for and by the State, without payment therefore, was clearly the result of "perverse reading of prior law" as inferentially condemned in *O'Neil v. Northern Colorado Irrigation Co.,* 242 U.S. 20, 26, 37 S.Ct. 7, 61 L.Ed. 123 (1916), and in contravention of the principles laid down in *Muhlker v. New York & Harlem R.R.,* 197 U.S. 544, 25 S.Ct. 522, 49 L.Ed. 872 (1905). Even though the

court may have been motivated to act because the justices thought it was for the best interest of Hawaii that surplus water be publicly owned and that the rivers should flow, undiminished, to the sea, the court could not and cannot take away the private property of the plaintiffs without paying them for it. The Fourteenth Amendment so commands.

Those portions of *McBryde I and II* holding that the State owns all surplus water and, under the aegis of the English common law doctrine of riparian rights, restraining the free diversion of surface waters for use outside the lands of the plaintiffs to which they are appurtenant, must be declared untenable and void.

The injunction prayed for by the plaintiffs must be and is GRANTED.

The preceding ruling of this court, of course, does not disturb the findings of the state trial court regarding appurtenant water rights as affirmed in *McBryde I* 54 Haw. at 189, 504 P.2d 1330. Neither is *McBryde I*'s reversal, at 190, 504 P.2d 1330, of the trial court's finding anent G&R's claim of appurtenant water rights to 90 acres in Koula and Manuahi affected hereby.

*Prescriptive Rights*

The problem of McBryde's cross claim for prescriptive rights to 2,084,600 gallons per day of normal surplus water against G&R must still remain unsolved. The majority (then including Justice Levinson) in *McBryde I* were apparently too concerned with the public policy aspects of their opinion to give the question of prescriptive rights the attention it deserved. *McBryde I*'s reasoning is both confusing and ambiguous. While it held that the trial court was in error in deducting McBryde's "prescriptive right to water" from G&R, "*if* McBryde had been prescribing * * * water", the actual basis for that holding was that McBryde had been taking that water out of the State's quota of water— against which prescription could not run— then concluded that the trial court should not have imposed "a *double* burden on"

G&R by charging that amount against G&R's waters. *McBryde I* at 198, 504 P.2d 1330. (emphasis added). Just how this would have imposed a *idouble* burden on G&R is not apparent to this court. The opinion engendered further confusion by continuing: "However, the issue is academic now since under our holding" that the State owned the waters of the River "as between McBryde and the State, McBryde acquired no prescriptive right to water." *Id.* at 198, 504 P.2d at 1345.

Since the Supreme Court's belief that the trial court was in error was conditional: "*if* McBryde had been prescribing * * * water," inferentially from the State, it would appear that all the court actually held was that McBryde could not get prescriptive rights against the State.

Of course, this was never McBryde's claim. McBryde had always claimed that its prescriptive rights ran against G&R, that until G&R refined and tightened up its upstream waters and diversion systems, there was enough water coming downstream to supply *both* the State *and* McBryde with their respective quotas of appurtenant and prescriptive waters.

Justice Marumoto in *McBryde I* and joined by Justice Levinson in *McBryde II*, simplistically ruled that since "McBryde's intake points are below the diversion point of G&R", it gained no prescriptive rights against G&R because "adverse use does not run upstream." *McBryde I* at 205, 504 P.2d at 1348; *McBryde II*, 55 Haw. at 304, 517 P.2d 26.

Neither the majority nor the minority apparently considered the statement in *Gay II*, from which springs G&R's rights to surplus water: "In this court the parties *agreed* that there is normally a surplus of water flowing in the stream *over and above* the quantity required to satisfy the needs of * * * lower kuleanas and other lands in the ahupuaa of Hanapepe *which have become entitled to water by prescription* or to which water rights were appurtenant at the time when the land commission awards thereof were made." *Gay II* 31 Haw. at 382 (emphasis added).

Thus *Gay II preserved* to those water users below G&R's intake whatever prescriptive rights to water they may have acquired prior thereto. All prior water rights law recognized the same basic principle. The term "normal surplus" was based on that premise. It would appear therefore that the Utah and Oregon cases cited by Justice Marumoto are inapposite in the light of well settled Hawaiian law that downstream owners may acquire rights by adverse use against an upstream owner who never uses them during the whole period. *Lonoaea v. Wailuku Sugar Co., supra,* 9 Haw. n. 7, at 662–64; *Palolo Land & Imp. Co. v. Wong Quai, supra,* 15 Haw. n. 7, at 560–62; Hutchins, The Hawaiian System of Water Rights at 113–14.

Inasmuch as this court finds the language and rationale of *McBryde I* and *II* certainly so ambiguous and definitely insupportable as therein expressed, this court cannot positively conclude that a federal question is involved and therefore without prejudice to the claims of either G&R or McBryde, leaves the ultimate determination of their prescriptive rights claims to the Fifth Circuit Court sitting as statutory Water Commissioner, and exercising the jurisdiction that was retained by the judgment.

*Storm and Freshet Waters*

The problem of storm and freshet waters likewise must be left to the Fifth Circuit Court sitting as Water Commissioner. The majority reversed the trial court's award of all storm and freshet surplus waters and overruled *Carter* by stating again that the State owned all surplus water subject to common law riparian rights: "Thus 'storm and freshet' water is the property of the State and we overrule *Carter v. Hawaii,* 24 Haw. 47 (1917)." *McBryde I,* 54 Haw. at 200, 504 P.2d at 1345. The minority would have affirmed *Carter.*

This court having destroyed the basis for the majority's conclusions leaves the issue of "storm and freshet" waters to the trial court.

Plaintiffs will prepare the necessary order.